James B. Zouras, *pro hac vice* forthcoming
jzouras@stephanzouras.com
Ryan F. Stephan, *pro hac vice* forthcoming
rstephan@stephanzouras.com
Justin M. Caparco, *pro hac vice* forthcoming
jcaparco@stephanzouras.com
**STEPHAN ZOURAS, LLC**
222 West Adams Street, Suite 2020
Chicago, Illinois 60606
Phone: 312-233-1550

Matthew C. Helland, State Bar No. 250451
helland@nka.com
**NICHOLS KASTER, LLP**
235 Montgomery Street, Ste. 810
San Francisco, CA 94104
Telephone: (415) 277-7235

Robert L. Schug, State Bar No. 249640
schug@nka.com
Matthew H. Morgan, *pro hac vice* forthcoming
morgan@nka.com
Martin A. Sandberg *pro hac vice* forthcoming
msandberg@nka.com
**NICHOLS KASTER, PLLP**
80 South 8th Street, Ste. 4700
Minneapolis, MN 55402
Telephone: (612) 256-3200

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID TUCKER, and LUCILLE MORAGNE, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>BLOCK, INC., and CASH APP INVESTING, LLC,<br><br>      Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Violation of California's Unfair Competition Law, and<br><br>2) Negligence,<br><br>3) Unjust Enrichment.<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs DAVID TUCKER and LUCILLE MORAGNE (collectively "Plaintiffs") bring this action on behalf of themselves, and all others similarly situated, against Defendants BLOCK, INC., and CASH APP INVESTING, LLC, (collectively "Defendants" or "Cash App"). Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## NATURE OF THE CASE

1. Cash App, a leading digital payment app boasting more than 57 million monthly users, is legally obligated to comply with laws mandating customer verification and reporting procedures. Yet, two whistleblowers recently exposed that Cash App blatantly disregards these duties to maximize its profit.

2. This failure to comply with basic legal requirements has fueled the rise of a new disturbing type of scam, known as "pig butchering." In 2023 alone, the Federal Trade Commission ("FTC") reported losses of a staggering $10.4 billion from these types of scams, with that number only growing in 2024. Cash App could have prevented many of these scams by simply complying with its legal obligations imposed by laws designed to curb this very conduct. Its failure to do so has led to significant financial and emotional harm for countless individuals who have fallen victim to fraud.

3. Meanwhile, Cash App portrays itself as a safe and secure platform. But many consumers would not have used Cash App had they known it was actively flouting its legal obligations. Indeed, "trust" is often the top reason consumers adopt new financial technologies like Cash App. By misleading its users, Cash App not only breached that trust but also placed those individuals at significant risk.

4. Plaintiffs thus bring this action asserting claims of: (i) violations of California's Unfair Competition Law; (ii) negligence; and (iii) unjust enrichment. Plaintiffs bring this action on behalf of a nationwide class for damages, restitution, injunctive relief, and any other relief deemed appropriate by the Court.

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

5.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, there are more than 100 Class Members, and the matter is a class action in which members of the class are citizens of a different state from that of a defendant.

6.     This Court has personal jurisdiction because Defendant Block is headquartered in California and Defendants solicit customers and transact business in California. Plaintiffs are also informed and believe, and thereon allege, that acts and omissions giving rise to this action occurred in California.

7.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Block resides within this District and acts and omissions giving rise to this action occurred within this District.

8.     Pursuant to Local Rule 3-2(d), this matter is properly assigned to the San Francisco and Oakland Division of this district because Defendant Block is headquartered in San Francisco, California and Plaintiffs are informed and believe, and thereon allege, that this action arose in San Francisco, California.

## PARTIES

9.     Plaintiff Lucille Moragne ("Moragne") is, and at all times mentioned herein, was an individual citizen of the State of California. At all relevant times, she was a resident of Los Angeles County. Moragne would like to continue using Cash App's services in the future if and when they are compliant with the law, as more fully explained below, but she cannot readily determine whether Cash App's practices have come into compliance.

10.    Plaintiff David Tucker ("Tucker") is, and at all times mentioned herein, was an individual citizen of the State of California. At all relevant times, he was a resident of Los Angeles County. Tucker would like to continue using Cash App's services in the future if and when they are compliant with the law, as more fully explained below, but he cannot readily determine whether Cash App's practices have come into compliance.

11.     Defendant Block, Inc., is a Delaware corporation based in San Francisco, California. Defendant Cash App Investing is a subsidiary of Block, Inc.; it is a limited liability brokerage firm and investment advisor firm with its main offices located at 400 SW 6th Avenue, 11th Floor, Portland, OR 97204.

**FACTUAL ALLEGATIONS**

**I.     Pig Butchering Scams are Wreaking Financial Havoc on Unsuspecting Citizens.**

12.     American consumers lost a staggering $10 billion to scams in 2023 alone, according to reports to the Federal Trade Commission ("FTC").[1] Other studies estimate losses top $1.03 *trillion* globally.[2] Perhaps most shocking is that these numbers are likely underestimated, since the "vast majority of frauds are not reported."[3]

13.     Scams were not always this rampant. In 2020, for example, the FTC reported total losses from imposter and investment scams at a relatively modest $1.6 billion.[4] In the first three quarters of 2024, those same losses are reported to be $6 billion—on track to top $8 billion—*a 400% increase in just four years*.[5]

14.     A new type of cyber-crime, coined "pig butchering," is primarily responsible for this increase. The FTC characterizes pig butchering scams as "investment" or "imposter" fraud.

---

[1], *As Nationwide Fraud Losses Top $10 Billion in 2023, FTC Steps Up Efforts to Protect the Public*, FEDERAL TRADE COMMISSION (February 9, 2024), https://www.ftc.gov/news-events/press-releases/2024/02/nationwide-fraud-losses-top-10-billion-2023-ftc-steps-efforts-protect-public.

[2] Betty Lin-Fisher, *Scam losses worldwide this year are $1 trillion*, USA TODAY (November 7, 2024), https://www.usatoday.com/story/money/2024/11/07/scam-victims-1-trillion-losses/75967565007/.

[3] Emma Flecher, *Social media: a golden goose for scammers*, FEDERAL TRADE COMMISSION (October 6, 2023), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2023/10/social-media-golden-goose-scammers#2.

[4] *The Big View: All Sentinel Report*, FTC CONSUMER SENTINEL NETWORK (Year: 2020; Quarter: All), https://public.tableau.com/app/profile/federal.trade.commission/viz/TheBig-ViewAllSentinelReports/TopReports (last updated November 8, 2024).

[5] *Id*. (Year: 2024; Quarter: All).

In 2023, investment scams accounted for $4.8 billion of the reported losses, with an average loss of $8,000; imposter scams accounted for $2.7 billion, with average losses of $800.[6] The magnitude of these losses are increasing exponentially. In the first three quarters of 2024 alone, consumers lost $3.9 billion to investment scams and $2.1 billion to imposter scams—with an average loss of $9,170 and $800 respectively.[7]

15.    Pig butchering scams follow a predicable pattern. The Financial Crimes Enforcement Network ("FinCEN") describes these scams as:

> The victims in this situation are referred to as "pigs" by the scammers who leverage fictitious identities, the guise of potential relationships, and elaborate storylines to "fatten up" the victim into believing they are in trusted partnerships. The scammers then refer to "butchering" or "slaughtering" the victim after victim assets are stolen, causing the victims financial and emotional harm.  In many cases, the "butchering" phase involves convincing victims to invest in virtual currency, or in some cases, over-the-counter foreign exchange schemes—all with the intent of defrauding them of their investment.[8]

16.    The perpetrators of pig butchering scams are often brutal and sophisticated criminal syndicates, frequently located in Southeast Asia, and more recently around the world.[9] They target unsuspecting individuals looking for work, kidnap them, then force them to work on pig butchering scams in cramped conditions with limited food and water. If these victims fail to meet their expectations, they are beaten, humiliated, electrocuted, and placed in solitary confinement; there have also been reports of organ removal, sexual assault, re-trafficking into

---

[6] *Id*. (Year: 2023; Quarter: All).

[7] *Id*. (Year: 2024; Quarter: All).

[8] *FinCEN Alert on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering"*, FINCEN ALERT (September 28, 2023), https://www.fincen.gov/sites/default/files/-shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

[9] United Nations, O*nline Scam Operations and Trafficking into Forced Criminality in Southeast Asia: Recommendations for a Human Rights Response*, UNITED NATIONS HUMAN RIGHTS, https://bangkok.ohchr.-org/sites/default/files/wp_files/2023/08/ONLINE-SCAM-OPERATIONS-2582023.pdf (last visited January 7, 2025).

CLASS ACTION COMPLAINT

the sex sector, and even punishment by death. Studies estimate that 220,000 individuals throughout Myanmar and Cambodia are trafficked and forced to carry out these illegal scams.[10]

17.    While online scams have a long history in Southeast Asia, these scam organizations rose to prominence through their illegal "casino and online gambling operations." But the casinos were shut down when the pandemic hit, forcing the scam organizations to re-focus their attention on online fraud.

18.    The timing could not have been better for these criminal syndicates. The pandemic forced individuals to isolate themselves, and thus spend more time online. Many victims were lonely and seeking connections on dating apps, when they stumble on a profile displaying a lavish lifestyle. These profiles looked extremely realistic because the fraudsters utilize photos and videos stolen from data hacks and leaks. Once the fraudster and victim match, the fraudsters use pre-written scripts designed to create emotional reactions and nurture the victim's dependence on the scam. The fraudster will then introduce investing in some obscure crypto venture with the promises of extravagant returns, only for the victim to lose everything. Unfortunately, stories like these are all too common.[11]

19.    The pandemic also coincided with the rise of crypto—many scam victims were interested in these potential returns. Fraudsters used targeted advertisements on Google, YouTube, Facebook, TikTok, etc., to connect with the crypto-curious. Many of the ads featured AI-generated celebrity endorsements, such as Steve Wozniak, Elon Musk, or Bill Gates. [12] The advertisements typically lead to a realistic or spoofed website or app, where information about

---

[10] *Id.*

[11] *See, e.g.*, Kevin Roose, *Crypto Scammers' New Target: Dating Apps*, NEW YORK TIMES (February 21, 2022), https://www.nytimes.com/2022/02/21/technology/crypto-scammers-new-target-dating-apps.html.

[12] *See, e.g.*, Ethan Baron, *Apple co-founder Steve Wozniak wins latest round in lawsuit vs. YouTube over Bitcoin scam*, SEATTLE TIMES (March 21, 2024), https://www.seattletimes.com/-business/apple-co-founder-steve-wozniak-wins-latest-round-in-lawsuit-vs-youtube-over-bitcoin-scam/.

the crypto venture could be found. Additional information about these supposed crypto ventures can be found though Google searches, which often display phony international business registrations. They are also frequently supported by fervent groups of supposed investors on social media sites like Facebook, Telegram, or Discord. In these groups, individuals share their success stories and give tips on how to best maximize their returns.

20.    Once a victim begins investing, they see immediate returns. But some victims remain skeptical; sophisticated scam enterprises allow the victims to withdraw their supposed earnings to win their trust, tricking them into investing even more. Victims invest hundreds, thousands, sometimes up to millions before they attempt to withdraw their money. But once a victim tries to withdraw a substantial portion of their supposed earnings, the fraudsters explain that a tax or fee must be paid. Many victims realize they have been scammed here, but some are so desperate they send additional money, only to realize they will not recover any of it.

21.    The aftermath is devastating. Victims often lose their life savings; some victims report their losses to be in the millions. Some victims are forced to declare bankruptcy or sell their home to finance their newly realized debt.[13]

22.    The psychological effects are hidden, but equally real. Many victims never report their losses due to the embarrassment of falling for a scam. And research confirms that victims suffer significant psychological impacts, including depressive symptoms, shame, embarrassment, shock, anger, guilt, and worry.[14] Other studies show that victimization can result in physical health problems.[15]

---

[13] *See, e.g.*, Jason Knowles, *Woman loses nearly $1 million life savings in 'pig butchering' scam*, ABC7 NEW YORK (September 9, 2024), https://abc7ny.com/post/woman-living-illinois-loses-1-million-life-savings-pig-butchering-scam-forced-sell-home-belongings/15271332/.

[14] Jacqueline M. Drew, Julianne Webster, *The victimology of online fraud: A focus on romance fraud victimization*, THE JOURNAL OF ECONOMIC CRIMINOLOGY (March 2024), https://www.-sciencedirect.com/science/article/pii/S2949791424000058#bib9.

[15] Cassandra Cross, *'They're Very Lonely': Understanding the Fraud Victimisation of Seniors*, INTERNATIONAL JOURNAL FOR CRIME, JUSTICE, AND SOCIAL DEMOCRACY (December 1, 2016), https://www.sciencedirect.com/science/article/pii/S2949791424000058#bib9.

**II.     Cash App is Required to Comply with Laws Designed to Prevent Financial Fraud like Pig Butchering.**

23.     While the scam of pig butchering is a relatively new phenomenon, financial fraud is not. To this end, federal and state legislatures have enacted laws and regulations designed to "prevent, detect, and prosecute. . . financial frauds that prey on law-abiding citizens." *See* USA Patriot Act of 2001, 107 P.L. 56, 115 Stat. 272, 296; *see also, e.g.*, Cal. Fin. Code § 2002. These laws require financial institutions verify customer identity and establish procedures to report suspicious activity—commonly referred to as know your customer ("KYC") and anti-money laundering ("AML") procedures.

24.     These laws mandate that financial institutions implement "reasonable procedures" to verify the identity of their customers "to the extent reasonable and practicable." 31 USCA § 5318(l)(2). At a minimum, this must include the customer's "name, address, and other identifying information." *Id.* Banks must go a step further, they must obtain a customer's identification number *before* opening an account. 31 C.F.R. § 1020.220(a)(2).

25.     In certain circumstances, money services businesses must record and verify the identity of both parties to a transaction. 31 C.F.R. § 1022.312. This is triggered when, for example, the exchange of currency through a financial institution exceeds $10,000. *See* 31 C.F.R. § 1010.311. The verification and recording process should identify the account number and identification number: either a social security number, taxpayer identification number, passport number, alien identification card, or "other official document evidencing nationality or residence." *Id.*

26.     Money services businesses must also report suspicious activity. *See*, *e.g*., 31 CFR § 1022.320. The reporting requirement is triggered when a transaction "involves or aggregates" at least $2,000 and the financial institution "has reason to suspect" the transaction:

> (iii) Serves no business or apparent lawful purpose, and the reporting money services business knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.

> (iv) Involves use of the money services business to facilitate criminal activity.

27.     And, in September 2023, FinCEN issued a notice describing the mechanics of pig-butchering scams and reminding financial institutions of their obligation to report suspicious activity. The notice highlighted 15 red flags for institutions to monitor; several are especially relevant here:

> (1) A customer with no history or background of using, exchanging, or otherwise interacting with virtual currency attempts to exchange a high amount of fiat currency from an existing or newly opened bank account for virtual currency…
> …
>
> (4) A customer appears distressed or anxious to access funds to meet demands or the timeline of a virtual currency investment opportunity.
> …
>
> (7) A customer receives what appears to be a deposit of virtual currency from a virtual currency address at or slightly above the amount that the customer previously transferred out of their virtual currency account.  This deposit is then followed by outgoing transfers from the customer in substantially larger amounts.
>
> (8) Accounts with large balances that are inactive or have limited activity begin to show constant, uncharacteristic, sudden, abnormally frequent, or significant withdrawals of large amounts of money being transferred to a VASP or being exchanged for virtual currency.
> …
>
> (10) A customer with a short history of conducting several small-value EFTs to a VASP abruptly stops sending EFTs and begins sending multiple high-value wire transfers to accounts of holding companies, limited liability corporations, and individuals with which the customer has no prior transaction history.  This is indicative of a victim sending trial transactions to a scammer before committing to and sending larger amounts.
>
> (11) System monitoring and logs show that a customer's account is accessed repeatedly by unique IP addresses, device IDs, or geographies inconsistent with prior access patterns. Additionally, logins to a customer's online account at a VASP come from a variety of different device IDs and names inconsistent with the customer's typical logins.

28.     Cash App acknowledges it is a "money services business" subject to these laws.[16] Moreover, Cash App acknowledges that its "peer-to-peer" payments are "money transmission services" in many jurisdictions, thus requiring that Cash App maintain a license in those

---

[16] Block, Inc., *Annual Report* (Form 10-K) (February 22, 2024), at 18. Available at: https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001512673/000162828024006354/sq-20231231.htm.

CLASS ACTION COMPLAINT

jurisdictions.[17] Accordingly, Cash App maintains a license in all fifty states, and the District of Columbia.[18]

29.     And Cash App only allows United States or United Kingdom residents to open Cash App accounts.[19]

### III.    Cash App Willfully Neglects its Legal Duties in Pursuit of Higher Profits.

30.     Despite actual knowledge of its legal duty to verify accounts and report suspicious activity, Cash App fails to comply in both respects. In February of this year, two whistleblowers accused Cash App of performing "inadequate due diligence" on its customers, "potentially opening the door to money laundering, terrorism financing and other illegal activities."[20]

31.     These allegations are supported by YouTube videos and other tutorials demonstrating just how easy it is to circumvent Cash App's customer verification procedures. One video shows a non-US resident opening a Cash App account in minutes by using a basic Virtual Private Network ("VPN") and only providing an email.[21] Once the user created an account, they can begin sending and receiving money with any other Cash App user, despite having no US bank account. This verification process is blatantly non-compliant with the minimum KYC and AML requirements established by state and federal law.

---

[17] Block 10-K, *supra*, at 18.

[18] *Licenses*, WWW.BLOCK.XYZ, https://block.xyz/legal/licenses (last accessed January 7, 2025).

[19] Cash App Terms of Service, *supra*.

[20] Gretchen Morgenson, *Federal regulators are probing whether Cash App leaves door open to money launderers, terrorists*, NBC NEWS (February 16, 2024), https://www.nbcnews.com/-business/personal-finance/whistleblowers-cash-app-leaves-door-open-money-laundering-terror-rcna138958.

[21] *See, e.g.*, Stephen Finance, *How to Create Cash App Account in any Unsupported Country*, YOUTUBE (April 23, 2024), https://youtube.com/watch?v=REm_mGLiKNc&t=223s.

CLASS ACTION COMPLAINT

32.     And Cash App's structure creates a "shadow financial system" because it relies on several banking partners to conduct its services.[22] For example, Wells Fargo holds user funds so that they are eligible for Federal Deposit Insurance Corporation; Sutton Bank issues Cash App's prepaid debit cards; and, until recently, Lincoln Savings Bank handled deposits from Cash App customers.[23] These banks are subject to their own AML and KYC requirements—but Cash App's structure makes it nearly impossible for them to comply. Sutton Bank confirmed that it has "no way of knowing" where funds come from before the Cash App prepaid card is loaded. Cash App's banking partners are not able to adequately monitor and report suspicious activity. And since Cash App is failing to monitor transactions, fraudsters are essentially given free rein on the Cash App platform.

33.     The whistleblowers also accuse Cash App of providing services to entities under sanction. Interestingly, according to the whistleblowers, these entities are known to traffic in stolen data and operate illegal offshore gambling sites—both activities are tied to the rise of pig butchering scam operations.[24]

34.     Cash App's failures are not accidental—it made a calculated choice "to ease the process of opening accounts" to maximize revenues.[25] Until recently, Cash App outsourced its customer deposits to Lincoln Savings Bank. According to the whistleblowers, Lincoln Savings Bank's customer verification and reporting procedures "did not align with regulations" because Cash App pressured it to "ease" its customer verification procedures.

---

[22] Morgenson, *supra*, https://www.nbcnews.com/business/personal-finance/whistleblowers-cash-app-leaves-door-open-money-laundering-terror-rcna138958.

[23] *Id*.; *see also Is my Cash App balance eligible for FDIC pass-through insurance?*, CASH APP SUPPORT, https://cash.app/help/6500-is-my-cash-app-balance-insured-by-the-fdic (last accessed January 7, 2025).

[24] United Nations, *supra*, https://bangkok.ohchr.org/sites/default/files/wp_files/2023/08/-ONLINE-SCAM-OPERATIONS-2582023.pdf (last visited January 7, 2025).

[25] Morgenson, *supra*, https://www.nbcnews.com/business/personal-finance/whistleblowers-cash-app-leaves-door-open-money-laundering-terror-rcna138958.

CLASS ACTION COMPLAINT

35.    Cash App is fully aware of the threats that scams pose to unsuspecting Cash App users. On its website, Cash App acknowledges that "[s]cammers steal millions of people's money and personal info every year" and that it "help[s] you know what to do if you spot a scam."[26] But Cash App ignores the fact that simply following its legal obligations would prevent many, if not most, scammers from gaining access to the platform in the first place; and even if scammers did slip past the customer verification procedures, suspicious activity reporting procedures would quickly expose fraudulent accounts.

36.    It is not a coincidence that the top payment method for imposter and investment scams was either crypto currency or "payment apps" in 2024.[27]

37.    Cash App claims to have strengthened its customer vetting processes, but even these efforts fall well short of meeting KYC requirements. For one, when users sign up, Cash App requires them to provide a name, date of birth, and link a bank account. The users then create a unique username, called a "$Cashtag." But Cash App permitted accounts opened before it implemented these changes, tens of thousands of them, to remain active. Beyond that, a user can create a "restricted" account with minimal identifying information. While restricted accounts cannot send funds, they can receive funds, allowing fraudsters to propagate their scams.

38.    Thanks to its lax customer verification and fraud prevention procedures, Cash App can process more transactions, directly translating to higher profits. And it reaps substantial profits. According to its most recent annual report, it earned $4.3 billion in gross profits in 2023.[28]

39.    Bitcoin fees are its primary source of revenue—bringing in $9.5 billion.[29] When a user purchases bitcoin, Cash App purchases that amount of bitcoin from "private broker-dealers

---

[26] *Outsmart Scams*, WWW.CASH.APP, https://cash.app/outsmart-scams (last accessed January 7, 2025).

[27] *Fraud Facts*, FTC CONSUMER SENTINEL NETWORK (Fraud Category: Imposter Scams; Year: 2024; Quarter: All), https://public.tableau.com/app/profile/federal.trade.commission/viz/-FraudReports/FraudFacts (last updated November 8, 2024).

[28] Block, Inc., 10-K, *supra*, at 65.

[29] *Id.* at 71

CLASS ACTION COMPLAINT

or from Cash App customers…"[30] Cash App charges a fee on this transaction—typically between 0.75%-3%.[31] Once the bitcoin is in the user's account, the user can send that money to any $Cashtag, bitcoin wallet, or phone number. If the user wants to speed up the transfer, Cash App charges another fee. For "priority" transfers, Cash App charges a pro rata fee plus up to $3; for "rush" transactions, Cash App charges a pro rata fee plus up to $2.[32]

40.    Cash App's other sources of revenue are transaction and subscription fees, totaling $6.3 billion and $5.9 billion respectively. Transaction fees vary depending on the circumstances. For example, Cash App charges a fee between 0.5%-1.75% to transfer money instantly.[33]

41.    And so, Cash App has a perverse incentive to encourage pig butchering scams on its platform because they primarily use bitcoin and involved "priority" or "rush" transactions. Cash App has unequivocally chosen to act on that incentive, despite the enormous hardship it has causes to victims of financial fraud.

42.    Implementing reasonable customer verification and suspicious activity reporting procedures is not unduly burdensome on Cash App; indeed, Cash App is ***legally required*** to maintain such reasonable procedures.

**IV.    To Win Consumers Over, Cash App Represents Itself as "Safe" and "Secure."**

43.    Studies consistently find that "trust" and "security" are the top concerns consumers have when deciding whether they should adopt a new financial technology

---

[30] *Id*. at 68.

[31] *Bitcoin Pricing*, CASH APP SUPPORT (October 20, 2023), https://cash.app/help/3103-bitcoin-pricing.

[32] *Id*.

[33] *Withdrawal Transfer Speed Options*, CASH APP SUPPORT, https://cash.app/help/3073-withdrawal-transfer-speed-options (last accessed January 7, 2025).

("FinTech").[34] Other studies suggest "robust regulation" helps FinTech companies because it fosters public trust.[35] That is because consumers are consistently concerned that the "pace of technology is too fast."[36] Unfortunately, the concerns of these consumers have been proven well-founded, given that pig butchering scams spread like wildfire since the rise of digital payment apps.

44.    To capitalize on consumer desire for safety and security, Cash App represents itself as a "safe space for your money." [37] Despite failing to comply with basic KYC and AML requirements, it claims to help "fight fraud before it happens" and that it notifies users "for suspicious activity." These types of advertisements are self-serving attempts to convince consumers that Cash App is safe, resulting in more downloads and more profits.  Indeed, Cash App's financial statements explain that "earning [customer] trust is a key factor in how we can deepen our financial relationship with them" and that "building and maintaining deep trust with our customers will drive greater product adoption and increased inflows into our ecosystem"

45.    Consumers would not have used Cash App's platform, or would have paid less for its services, had they known Cash App blatantly disregards their financial safety and security by failing to comply with basic laws and regulations.

---

[34] *See, e.g.*, Global FinTech Adoption Index 2019, EY, available at https://x.fintechamericas-.co/ey-global-fintech-adoption-index-report; *see also* Taewoo Roh, Young Soo Yang, Shufeng Xiao, & Byung Il Park, *What Makes Consumers Trust and Adopt Fintech? An Empirical Investigation in China*, SPRINGER NATURE LINK (January 26, 2022), https://link.springer.com-/article/10.1007/s10660-021-09527-3.

[35] Johan Ariff Jafri, Syajarul Imna Mohd Amin, Aisyah Abdul Rahman, & Shifa Mohd Nor, *A systematic literature review of the role of trust and security on Fintech adoption in banking*, SCIENCE DIRECT (January 15, 2024), https://www.sciencedirect.com/science/article/pii/S-2405844023101885#:~:text=The%20escalation%20of%20cyberattacks%20and,18%2C19%2C 20%5D.

[36] *Why Consumers Just Don't Trust Fintechs*, EDELMAN (August 26, 2020), https://www.-edelman.co.uk/why-consumers-just-dont-trust-fintechs.

[37] *Cash App Security*, https://cash.app/security (last accessed January 7, 2025).

CLASS ACTION COMPLAINT

**PLAINTIFFS' EXPERIENCES**

46.    In early 2024, Plaintiff Moragne came across an ad for Ultimate Partners Investments ("UPI") on TikTok and Facebook promising vast returns from a crypto venture.

47.    Around the same time, Plaintiff Tucker found UPI through Telegram, and was invited to the join their group by the administrator, Jim Antonio.

48.    UPI was registered with the Australian Securities & Investments Commission, had a brochure outlining its business model, a YouTube video explaining its business, a legitimate website, and was backed by a network of online supporters who fervently vouched for it via Telegram. The Telegram page had hundreds of members; many posted screenshots of their gains and openly discussed the extravagant wealth UPI brought them.

49.    Naturally, Tucker and Moragne wanted to share their discovery with others, so they told several friends and colleagues about UPI. Many invested.

50.    Plaintiffs navigated to the UPI website, where supposed employees walked the Plaintiffs through the investment process on a support line. The employees explained that investments needed to be made via bitcoin, so they directed Plaintiffs to create Cash App accounts so that their cash could be converted into bitcoin. Once the Plaintiffs' loaded their Cash App accounts with bitcoin, the employees would direct the Plaintiffs to send that bitcoin to a bitcoin wallet address or $Cashtag instantly.[38] Those bitcoin wallet addresses and $Cashtags could also be found on the telegram page.

51.    The fact that the scam happened on Cash App only strengthened the Plaintiffs belief that the investments were legitimate. Cash App is a publicly traded company, only allows US residents to open accounts, and is regulated by strict U.S. banking laws. Plus, it markets and holds itself out as safe and secure. Plaintiffs relied on these factors when deciding to invest in UPI.

---

[38] Cash App charged a fee each time the Plaintiffs exchanged their cash for bitcoin, and each time they transferred the bitcoin to the scammers.

CLASS ACTION COMPLAINT

52.    Some of the $Cashtags included:





These accounts are registered with Cash App, but they would have failed legally compliant customer verification protocols. Alternatively, legally compliant reporting procedures would have required that Cash App flag these accounts on several occasions. Cash App never notified Tucker or Moragne that transfers to these accounts, or other bitcoin wallets, might have been fraudulent. Remarkably, according to Plaintiffs' most recent search, both accounts are ***still active*** on Cash App.

53.    Both Moragne and Tucker started off small, investing only a few hundred dollars. Indeed, Tucker experienced some hesitation early on, and so requested a withdrawal after his initial investment—UPI complied, allowing him to withdraw approximately $200. Tucker told Moragne about this withdrawal.

54.    When Moragne's investments supposedly grew to $21,2138.90, she requested a withdrawal. UPI informed her, however, that she needed to pay a tax of $3,500 before she could withdraw any money. Moragne refused to pay this tax. After some back and forth with the UPI

CLASS ACTION COMPLAINT

employees and the Telegram moderator, she realized she had been scammed. In total, Moragne lost approximately $3,200.

55.      Around the same time, Tucker decided to withdraw some of his investments as well. His investments had supposedly grown to approximately $45,000. When he requested a withdrawal, UPI explained he needed to pay a tax and a fee. Tucker was hesitant but agreed to pay close to $6,000 in fees and taxes. Nonetheless, UPI requested more money, which is when he realized he had been scammed. In total, Tucker lost close to $20,000.

56.      Soon after the Plaintiffs realized they had been scammed, they were banned from the Telegram chat and their UPI accounts were removed.

57.      On top of the financial losses Tucker and Moragne suffered, they also dealt with the immense stress, anxiety, and embarrassment of falling for a scam. They each spent significant time trying to track down the UPI fraudsters, with little luck. Moragne, in particular, expended a considerable amount of time trying to recruit help. She filed reports with the Federal Trade Commission, the Federal Bureau of Investigation, the Securities and Exchange Committee, and Consumer Financial Protection Bureau. Each governmental entity explained to Moragne that they were unable to assist.

58.      Tucker and Moragne also spent considerable time trying to contact Cash App for help. Remarkably, at the time they were scammed, Cash App did not have a number to call for help. Nonetheless, Moragne persisted and communicated with Cash App via a chatbot and email, explained her situation, and asked to speak to someone. To date, Cash App has never responded to Moragne's requests.

## CLASS ALLEGATIONS

59.      Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated individuals (the "Class"), defined as follows:

**Nationwide Class**
All persons in the United States who, during the applicable statutory period, transferred money, bought bitcoin, or otherwise used the Cash App platform.

CLASS ACTION COMPLAINT

60.     Pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs also seek to represent the subclass defined as follows:

**Scam Subclass**
All persons in the United States who, during the applicable period, transferred money or bitcoin to a pig butchering scam operation through the Cash App platform.

61.     Excluded from the Class are any of Defendant's officers, directors, or employees; officers, directors, or employees of any entity in which Defendant currently has or has had a controlling interest; and Defendant's legal representatives, heirs, successors, and assigns.

62.     Currently, Plaintiffs do not know the exact number of Class Members; however, given the nature of the claims the number of Cash App users, Plaintiffs believe that the Class Members are so numerous that joinder of all members is impracticable. Moreover, FTC published that it received over 681,000 reports of imposter or investment related scams in the first three quarters of 2024 alone.[39]

63.     There are questions of law and fact common to the class that predominate over questions solely affecting individual members. The following questions of law and fact are common to the Class Members and predominate over questions that may affect individual Class Members, such as:

a.  Whether Cash App failed to comply with KYC, AML, and other applicable laws requiring it implement reasonable customer verification and suspicious activity reporting procedures.

b.  Whether Cash App's customer verification and suspicious activity reporting procedures complied with industry standards.

c.  Whether Cash App acted negligently in failing to implement reasonable customer verification and suspicious activity reporting procedures.

d.  Whether Cash App's advertising and/or marketing misrepresented the safety and security of its platform.

e.  Whether Cash App's failure to comply with the applicable laws constituted an unfair, unlawful, and/or deceptive trade practice;

---

[39] The Big View: All Sentinel Reports, *supra*, https://public.tableau.com/app/profile/federal.-trade.commission/viz/TheBigViewAllSentinelReports/TopReports (Year: 2024; Quarter: All).

f.  Whether Cash App participated in and pursued the common course of conduct complained of herein;

g.  Whether Cash App was unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Cash App to retain the benefits conferred upon it by Plaintiffs and the other Class Members; and

h.  Whether Plaintiffs and Class Members are entitled to restitution, monetary damages, and if so, what is the measure of the relief.

64.    Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all Class Members, transferred money on Cash App in a typical consumer setting and suffered harm from Cash App's wrongful conduct.

65.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in litigating complex class actions. Plaintiffs have no interests that conflict with those of the Class.

66.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as Cash App has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole. Cash App's conduct is generally applicable to the Class as a whole and Plaintiffs seek, inter alia, equitable remedies with respect to the Class as a whole. As such, Cash App's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

67.    The litigation of separate actions by Class Members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Cash App.

68.    The requirements of Fed. R. Civ. P. 23(b)(3) are met as common issues predominate over any individual issues, and treatment of this matter as a class action is superior to numerous individual actions.

69.    Plaintiffs and other Class Members have suffered losses as a result of Cash App's unlawful and wrongful conduct. Absent a class action, Cash App will retain substantial funds received as a result of its wrongdoing, and such unlawful and improper conduct shall, in large measure, not go remedied. Absent a class action, the members of the Class will not be able to

effectively litigate these claims and will suffer further losses, as Cash App will be allowed to continue such conduct with impunity and retain the proceeds of its ill-gotten gains.

**COUNT I**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. Prof. Code. § 17200, *et seq.*,**
(On Behalf of Plaintiffs and the Nationwide Class)

70.     Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

71.     By failing to implement reasonable customer verification and suspicious activity reporting procedures, along with the other allegations herein, Cash App has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the Class as a whole, by engaging in unlawful, fraudulent, and unfair conduct.

72.     Cash App has violated the UCL's proscription against engaging in unlawful conduct as a result of:

     a.   violations of the Bank Secrecy Act. 31 USCA § 5311 *et seq.*

     b.   violations of state law equivalents, such as the California Money Transmission Act. *See, e.g.*, Cal. Fin. Code § 2000 *et seq.*

73.     Cash App has failed to implement reasonable customer verification or reporting procedures as required by these statutes. *See* 31 USCA § 5318(l)(2); *see also* 31 CFR § 1022.320. Whistleblowers confirmed that Cash App has no way to verify the identity of its customers, and that Cash App pressured its partner banks to skip traditional customer verification procedures.

74.     Cash App's failure to comply with these laws also violates the UCL's proscription against unfair conduct. Cash App is legally required to establish customer verification procedures and monitor suspicious activity. Its failure to comply foreseeably leads to the festering of pig butchering scams on its platform. Such a failure is against public policy, and is immoral, oppressive, unscrupulous, and substantially injures consumers. This is especially true given that Cash App recognizes the dangers of pig butchering scams.

75.     In addition, Cash App's practices as described above also violate the UCL's proscription against engaging in fraudulent conduct. Despite failing to comply with the easy to

follow KYC and AML requirements, Cash App promoted itself as "safe" and "secure." It went so far as to claim it "fight[s] fraud before it happens" and that it notifies users "for suspicious activity." None of this is true. Instead, Cash App's representations are a calculated attempt to capitalize on the largest factor that convinces new consumers to adopt FinTech—trust.

76.    As a result, Plaintiffs and Class Members have suffered injury in fact and have lost money or property as a result of Cash App's violation of these statutes. Plaintiffs and Class Members would not have used Cash App had they known it is not a safe and secure platform, or that it fails to comply with basic legal obligations. Alternatively, Plaintiffs would have paid less for Cash App's services.

77.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the Class seek an order of this Court that includes, but is not limited to, an order requiring Cash App to:

a.    provide restitution to Plaintiff and the other Class Members;

b.    disgorge all revenues obtained as a result of violations of the UCL;

c.    remove any representations that Cash App is "safe," "secure," or that it helps fight fraud from its website or other marketing materials;

d.    implement reasonable and compliant customer verification and reporting procedures; and

e.    pay Plaintiff's and the Class's attorney fees and costs.

## COUNT II
## NEGLIGENCE
(On Behalf of the Plaintiffs and the Scam Subclass)

78.    Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

79.    Defendants owed Plaintiffs and the Scam Subclass a duty to protect their financial accounts from malicious third parties, to adequately warn them of known risks and/or dangers associated with the Cash App platform, to take appropriate steps in response to known scams involving the Cash App platform, to provide an adequate customer support helpline, and to properly investigate disputed transactions initiated and consummated through Cash App.

80.     Defendants had a common law duty to prevent foreseeable harm to others. Plaintiffs and the Scam Subclass were the foreseeable and probable victims of failing to comply with the duties listed above. It was foreseeable that Plaintiffs and the Scam Subclass would fall victim to scams on its platform due to Cash App's failure to adhere to its legal duties as set forth above.

81.     Defendants' duties also arise by operation of statute:

a.  The Bank Secrecy Act ("BSA") and its implementing regulations require financial institutions, like Cash App, to maintain reasonable customer verification and suspicious activity reporting procedures. *See* 31 USCA § 5318(l)(2); *see also* 31 CFR § 1022.320.

b.  The California Money Transmission Act ("CMTA"), along with other state money transmission acts, require licensed entities, like Cash App, to follow the BSA's implementing regulations. Cal. Fin. Code § 2123.

82.     Defendants are "financial institutions" under the BSA. 31 USCA § 5312(a)(2). Defendants are also licensed money transmission services under the CMTA, and other state law equivalents. Cal. Fin. Code § 2003.

83.     Cash App knows it is subject to these legal requirements. It further knows the threat that scams pose to unsuspecting Cash App users. Despite this, Cash App flouted its legal obligations in pursuit of higher profits.

84.     The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a.  Failing to maintain adequate safeguards on customer financial information;

b.  Failing to protect customer financial accounts from malicious third parties;

c.  Failing to adequately warn customers of known risks and/or dangers associated with the Cash App platform;

d.  Failing to take appropriate steps in response to known scams involving the app to protect consumers from malicious third parties;

e.  Failing to adequately investigate and document suspicious activity as required by law;

f.  Failing to implement reasonable customer verification procedures as required by law;

g.  Failing to provide an adequate customer support helpline, and to properly investigate disputed transactions initiated and consummated through Cash App;

h.  Failing to reverse fraudulent transactions upon a sufficient showing by Plaintiffs and the Scam Subclass that the transfers were fraudulent;

i.  Failed to prevent the spread of pig butchering scams by failing to comply with simple legal obligations; and

j.  Allowing fraudsters to leverage the Cash App platform with little to no oversight.

85.    Plaintiffs and the Scam Subclass were the foreseeable victims of Cash App's inadequate customer verification and suspicious activity reporting requirements. The natural and probable consequences of Cash App's failing to implement reasonable such procedures was the Plaintiffs and the Scam Subclass transferring funds to accounts that should not have been on the platform.

86.    It was foreseeable to Cash App that its failure to implement reasonable security measures to protect Plaintiffs and the Scam Subclass would result in injury to Plaintiffs and the Scam Subclass. Indeed, Cash App acknowledges the prevalence of such scams on its website.

87.    It was also foreseeable to Cash App that failing to investigate reports of fraud and offer an adequate customer help hotline would harm Plaintiffs and the Scam Subclass.

88.    There is a close connection between Cash App's failures and the injuries suffered by Plaintiffs and the Scam Subclass. If Cash App had implemented adequate customer verification and reporting procedures, many if not most of the fraudsters would not have been allowed on the platform for failing to provide consistent and legitimate identifying information. And even if some fraudsters made it past improved customer verification procedures, Cash App should have improved reporting procedures which would easily catch many of the fraudulent transfers that victims make.

89.    Accordingly, Plaintiffs and the Scam Subclass have suffered damages that include, or may include in the future, without limitation: (1) the loss of significant amounts of money; (2) lost time in trying to track down lost funds; and (3) out-of-pocket costs in trying to track down lost funds.

**COUNT III**
**UNJUST ENRICHMENT**
(On Behalf of Plaintiffs and the Nationwide Class)

90. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

91. Plaintiffs and the National Class conferred benefits on Cash App by using Cash App's platform and paying it fees.

92. Cash App has knowledge of such benefits, and voluntarily accepts and retains these benefits.

93. Cash App has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the National Class's use of the Cash App platform.

94. Retention of that money under these circumstances is unjust and inequitable because Cash App failed to comply with basic legal requirements, as alleged throughout. At the same time, Cash App represented its platform as "safe" and "secure," when it is neither.

95. These failures and misrepresentations caused injuries to Plaintiffs and the National Class because they would not have used the Cash App platform, or they would have not paid as much for Cash App's services had they known of Cash App's failures.

96. Because Cash App's retention of the non-gratuitous benefits conferred to it by Plaintiffs and the National Class is unjust and inequitable, Defendant ought to pay restitution to Plaintiffs and the National Class for its unjust enrichment.

**PRAYER FOR RELIEF**

Wherefore Plaintiffs, individually and on behalf of all Class Members and all others similarly situated, prays for relief as follows relating to her collective, class and representative action allegations:

1. An order certifying the proposed Class; appointing Plaintiffs as representatives of the Class; and appointing Plaintiffs' undersigned counsel as Class counsel;

2. That the Court award Plaintiffs, the Class, and the Scam Subclass, restitutionary disgorgement, actual damages, respectively, in an amount to be determined at trial;

3. That the Court award Plaintiff and Class Members pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

CLASS ACTION COMPLAINT

4.      That the Court issue the equitable relief against Defendant to Plaintiffs and Class Members are entitled;

5.      That the Court award any and all other such relief as the Court may deem just and proper under the circumstances; and

6.      A declaration that Cash App is financially responsible for notifying Class Members of the pendency of this suit.

### **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury for all claims so triable.

Dated: January 10, 2025          **STEPHAN ZOURAS LLC**
                                 **NICHOLS KASTER, LLP**
                                 **NICHOLS KASTER, PLLP**

                    By:    _s/    *Robert L. Schug*_
                                 Robert L. Schug

                           Attorneys for Plaintiffs the Proposed Class