1  COOLEY LLP
   WILLIAM K. PAO (252637)
2  wpao@cooley.com
   ALEXANDRA R. MAYHUGH (300446)
3  amayhugh@cooley.com
   ALEXANDER G. GALICKI (308737)
4  agalicki@cooley.com
   355 South Grand Avenue, Suite 900
5  Los Angeles, CA 90071
   Telephone:    +1 213 561 3250
6  Facsimile:    +1 213 561 3244

7  COOLEY LLP
   JEFFREY M. GUTKIN (216083)
8  jgutkin@cooley.com
   3 Embarcadero Center, 20th Floor
9  San Francisco, California 94111-4004
   Telephone:    +1 415 693 2000
10 Facsimile:    +1 415 693 2222

11 *Attorneys for Defendants*

12

                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16 DAVID TUCKER, and LUCILLE            Case No. 3:25-cv-00370-MMC
   MORAGNE, individually and on behalf
17 of all others similarly situated,     **DEFENDANT BLOCK, INC.'S NOTICE OF
                                         MOTION AND MOTION TO DISMISS
18              Plaintiffs,              PLAINTIFFS' COMPLAINT**

19        v.

20 BLOCK, INC. and CASH APP             Date:    May 30, 2025
   INVESTING, LLC,                      Time:    9:00 a.m.
21                                      Dept:    Courtroom 7, 19th Fl.
               Defendant.               Judge:   Maxine M. Chesney
22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................................ 1

STATEMENT OF REQUESTED RELIEF .................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

I.     INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND .............................................................................................................. 3

    A.    Online Scams Are Sophisticated Schemes, Utilizing a Variety of Methods to Lure Victims. ................................................................................................................. 3

    B.    Block Warns Customers About the Risks of Fraud and Scams on the Cash App Platform. 4

    C.    "Ultimate Partners Investments" Convinces Plaintiffs to Invest Thousands of Dollars. ...... 5

    D.    Plaintiffs Do Not Identify What Part of UPI's Fraudulent Scheme, If Any, Should Have, or Even Could Have, Been Detected by Block. .................................................... 7

III.   ARGUMENT .................................................................................................................. 8

    A.    Plaintiffs Lack Standing Because They Cannot Tie Any Deficient KYC or AML Requirement to the UPI Scam and Their Resulting Harm. .................................................. 8

    B.    By Focusing on General Policy Concerns and Irrelevant Facts, the Complaint Violates Rule 8. ................................................................................................................. 13

    C.    Plaintiffs Cannot State a UCL Claim Based on Alleged Violations of the BSA or Related State Law Statutes. ........................................................................................... 14

    D.    Plaintiffs Fail to State a Claim for Negligence. ....................................................... 18

    E.    Plaintiffs Fail to State a Claim for Unjust Enrichment. ............................................ 22

IV.    CONCLUSION .............................................................................................................. 23

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

*In re Actimmune Mktg. Litig.*,
  2009 WL 3740648 (N.D. Cal. Nov. 6, 2009), *aff'd*, 464 F. App'x 651 (9th Cir.
  2011) ................................................................................................................ 16

*In re Agape Litig.*,
  681 F. Supp. 2d 352 (E.D.N.Y. 2010) ............................................................... 21

*Anderson v. Jamba Juice Co.*,
  888 F. Supp. 2d 1000 (N.D. Cal. 2012) ......................................................... 5, 11

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
  802 F. Supp. 2d 1070 (N.D. Cal. 2011) ............................................................ 22

*In re Bank of Am. Cal. Unemployment Benefits Litig.*,
  674 F. Supp. 3d 884 (S.D. Cal. 2023) ............................................................... 19

*Biakanja v. Irving*,
  49 Cal. 2d 647 (1958) ........................................................................................ 19

*Bibicheff v. PayPal, Inc.*,
  844 F. App'x 394 (2d Cir. 2021) ..................................................... 15, 19, 20

*Bily v. Arthur Young & Co.*,
  3 Cal.4th 370 (1992) .......................................................................................... 19

*BMA LLC v. HDR Glob. Trading Ltd.*,
  2021 WL 949371 (N.D. Cal. Mar. 12, 2021) ................................................. 9, 10

*Bryan v. Del Monte Foods, Inc.*,
  2023 WL 4758452 (N.D. Cal. July 25, 2023) (Chesney, J.) ............................ 23

*Caraccioli v. Facebook, Inc.*,
  167 F. Supp. 3d 1056 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir.
  2017) ................................................................................................................ 12

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
  911 F.2d 242 (9th Cir. 1990) ............................................................................ 16

*Copesky v. Super. Ct.*,
  229 Cal. App. 3d 678 (1991) ............................................................................. 20

*Cousart v. OpenAI LP*,
  2024 WL 3282522 (N.D. Cal. May 24, 2024) .................................................. 14

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Davis v. HSBC Bank Nev., N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ............................................................................. 18

*Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*,
  2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) ................................................... 18, 19

*Elias v. Hewlett-Packard Co.*,
  903 F. Supp. 2d 843 (N.D. Cal. 2012) .................................................................. 18

*Gardiner v. Walmart Inc.*,
  2021 WL 2520103 (N.D. Cal. Mar. 5, 2021) ......................................................... 19

*Glen Holly Ent. Inc. v. Tektronix Inc.*,
  343 F.3d 1000 (9th Cir. 2003), *opinion amended on denial of reh'g*, 352 F.3d
  367 (9th Cir. 2003) ............................................................................................... 16

*Greenstein v. Noblr Reciprocal Exch.*,
  585 F. Supp. 3d 1220 (N.D. Cal. 2022) ................................................................. 12

*Gudgel v. Clorox Co.*,
  514 F. Supp. 3d 1177 (N.D. Cal. 2021) ................................................................. 22

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................. 17

*Halton Co. v. Streivor, Inc.*,
  2010 WL 2077203 (N.D. Cal. May 21, 2010) ....................................................... 16

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
  2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) (Chesney, J.) ................................. 22

*Hawkins v. Shimano North America Bicycle Inc.*,
  729 F.Supp.3d 989 (C.D. Cal. 2024) ..................................................................... 22

*Herrick v. Grindr, LLC*,
  306 F. Supp. 579 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019) ............... 13, 17

*Holmes v. Johnson & Johnson*,
  617 F. App'x 639 (9th Cir. 2015) .......................................................................... 17

*J'Aire Corp. v. Gregory*,
  24 Cal. 3d 799 (1979) ........................................................................................... 19

*Johnson v. Maker Ecosystem Growth Holdings Inc.*,
  2023 WL 2191214 (N.D. Cal. Feb. 22, 2023) (Chesney, J.) .................................. 19

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) .......................................................................... 14, 16

COOLEY LLP
ATTORNEYS AT LAW

iii

DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S COMPLAINT
CASE NO. 3:25-CV-00370-MMC

*Kent Grp. Partners, LLC v. Citizens Bank, Nat'l Ass'n*,
688 F. Supp. 3d 608 (N.D. Ohio 2023), *aff'd sub nom. Kent Grp. Partners,
LLC v. Citizens Bank, NA*, 2024 WL 945239 (6th Cir. Mar. 5, 2024) ............................. 15, 21

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........................................................................................... 4

*Klein v. Chevron U.S.A., Inc.*,
202 Cal. App. 4th 1342 (2012) ....................................................................................... 22

*Knuttel v. Omaze, Inc.*,
2022 WL 1843138 (C.D. Cal. Feb. 22, 2022) .................................................................. 17

*Kurtz-Ahlers, LLC v. Bank of Am., N.A.*,
48 Cal. App. 5th 952 (2020) ........................................................................................... 20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ......................................................................................................... 9

*Martin v. Sephora USA, Inc.*,
2023 WL 2717636 (E.D. Cal. Mar. 30, 2023) ................................................................. 14

*Mayron v. Google LLC*,
54 Cal. App. 5th 566 (2020) ........................................................................................... 15

*McCann v. Lucky Money, Inc.*,
129 Cal. App. 4th 1382 (2005) ....................................................................................... 15

*McKell v. Wash. Mut., Inc.*,
142 Cal. App. 4th 1457 (2006) ................................................................................... 17, 18

*Medoff v. Minka Lighting, LLC*,
2023 WL 4291973 (C.D. Cal. May 8, 2023) ................................................................... 23

*Meisner v. JPMorgan Chase Bank, N.A.*,
2022 WL 837230 (E.D. Cal. Mar. 21, 2022) ................................................................... 18

*MH Pillars Ltd. v. Realini*,
2017 WL 916414 (N.D. Cal. Mar. 8, 2017) ..................................................................... 20

*O'Donnell v. Bank of Am., Nat'l Ass'n*,
504 F. App'x 566 (9th Cir. 2013) ................................................................................... 15

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ...................................................................... 5, 17

*Public Serv. Co. of Okla. v. A Plus, Inc.*,
2011 WL 3329181 (W.D. Okla. Aug. 2, 2011) ................................................................ 21

*Quelimane Co. v. Stewart Title Guaranty Co.*,
   19 Cal.4th 26 (1998) ................................................................................................. 19

*R.C. v. Walgreen Co.*,
   733 F. Supp. 3d 876 (C.D. Cal. 2024) ...................................................................... 23

*S&S Worldwide, Inc. v. Wells Fargo Bank*,
   509 F. Supp. 3d 1154 (N.D. Cal. 2020) .................................................................... 21

*Sandoval v. Bank of Am.*,
   94 Cal. App. 4th 1378 (2002) ................................................................................... 21

*Sateriale v. R.J. Reynolds Tobacco Co.*,
   697 F.3d 777 (9th Cir. 2012) .................................................................................... 16

*Shang v. Twitch Interactive, Inc.*,
   2025 WL 56415 (N.D. Cal. Jan. 9, 2025) ............................................................ 5, 11

*Silver v. Stripe Inc.*,
   2021 WL 3191752 (N.D. Cal. July 28, 2021) ........................................................... 16

*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*,
   49 Cal. App. 4th 472 (1996) .................................................................................... 20

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) .................................................................................... 23

*Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Grp.*,
   143 Cal. App. 4th 1036 (2006) ................................................................................ 20

*SVB Fin. Grp. v. Fed. Deposit Ins. Corp.*,
   2024 WL 3745009 (N.D. Cal. Aug. 8, 2024) ........................................................... 11

*Tristan v. Bank of Am.*,
   2023 WL 4417271 (C.D. Cal. June 28, 2023) ..................................................... 19, 20

*Vasquez v. Residential Invs., Inc.*,
   118 Cal. App. 4th 269 (2004) ................................................................................... 21

*Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*,
   2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) ...................................................... 15, 21

*Wash. Env't Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) .................................................................................... 9

*Whitesides v. E\*TRADE Sec., LLC*,
   2021 WL 930794 (N.D. Cal. Mar. 11, 2021) ............................................................ 21

**Statutes**

Bank Secrecy Act .................................................................................................... *passim*

California Money Transmission Act ....................................................................... 15, 16

FTC Act ....................................................................................................................... 15

**Other Authorities**

Fed. R. Civ. P.
    Rule 8 ..................................................................................................... 2, 8, 13, 14
    Rule 9(b) ....................................................................................................... 16
    Rule 12(b)(1) ................................................................................................. 12

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S COMPLAINT
CASE NO. 3:25-CV-00370-MMC**

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that on May 30, 2025, at 9:00 a.m., before the Honorable Maxine M. Chesney, Defendant Block, Inc. ("Block") will, and hereby does, move this Court for an order dismissing Plaintiffs' Class Action Complaint ("Complaint") pursuant to Federal Rules of Civil Procedure 8, 12(b)(1), and 12(b)(6).[1]

**STATEMENT OF REQUESTED RELIEF**

Block respectfully requests that the Court dismiss the Complaint in full and with prejudice because Plaintiffs lack standing to bring the asserted claims pursuant to Rule 12(b)(1), fail to meet the minimum pleading standards of Rule 8, and fail to state a claim upon which relief can be granted under Rule 12(b)(6).

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Online scams can be a serious problem for their victims. Such schemes are often orchestrated by sophisticated criminals, using elaborate social engineering tactics to build trust and extract fraudulent investments. Criminals typically lure victims on social media platforms, create elaborate paper trails to bolster the fictional "investment" opportunity—*e.g.*, fake websites and fraudulent business registrations—and manufacture devoted followings to share purported success stories. Indeed, that is exactly what Plaintiffs allege here—a sophisticated scheme that tricked them, alongside other customers (some of whom Plaintiffs themselves recruited), to invest in a crypto scam via social media (TikTok, Facebook), messages (Telegram), videos (YouTube), and word of mouth.

Companies like Block and law enforcement officials devote significant time, attention, and money to preventing, detecting, and remediating these scams. But those efforts are not perfect, nor does the law require perfection. Nonetheless, Plaintiffs seek to foist responsibility for this wrongdoing onto Block by baldly asserting that it should have detected and prevented the fraud that allegedly befell them. But that fraud occurred primarily—if not solely—on third-party

---

[1] Plaintiffs voluntarily dismissed Defendant Cash App Investing LLC on April 11, 2025. *See* ECF No. 38.

platforms like TikTok, Facebook, Telegram, and YouTube.  And Plaintiffs' Complaint contains no factual allegations connecting their unfortunate experiences to any alleged deficiency in Block's practices or procedures.  Absent factual allegations of *causation*, holding third parties like Block liable via this private litigation is not just unjustified, it is legally untenable.

Relying on a single news article citing purported whistleblower allegations about Block's pre-2022 compliance protocols, Plaintiffs speculate that if Block had better anti-money laundering ("AML") and know-your-customer ("KYC") procedures in place, it would have prevented the scam they fell victim to in 2024.  Yet Plaintiffs do not identify a single actual AML or KYC requirement that Block allegedly failed to implement, much less allege how that particular procedure would have thwarted the tactics employed by these scammers.  AML and KYC protocols are not, and are not required to be, infallible.  To the contrary, companies are expected to implement risk-based compliance programs—*i.e.*, programs that allocate compliance resources commensurate with risk—and even regulators—who singularly possess the ability to enforce statutes like the Bank Secrecy Act ("BSA")—acknowledge the challenges in detecting complex frauds such as the one alleged.

The Complaint deals in generalities, alleging little more than: scams are bad, Block's procedures supposedly fall short of best practices, and Plaintiffs were the victims of a recent third-party scam, but somehow Block should be liable for their losses.  But a lawsuit must allege a factual basis to plausibly infer that the defendant is responsible for the plaintiff's alleged injuries—not a series of unconnected assertions.  Because Plaintiffs did not—and cannot—show causation, their claims fail both for lack of standing and on the merits.

Even if Plaintiffs were somehow able to allege causation—which they cannot—their claims would nonetheless fail for multiple other reasons.  *First*, the Complaint consists of generic policy concerns and information irrelevant to Plaintiffs' claims and, accordingly, violates Rule 8.  *Second*, Plaintiffs cannot state a UCL claim based on alleged violations of the BSA or related state law statutes because neither offers a private right of action.  And, even if they did, Plaintiffs do not adequately plead how Block violated the BSA or unnamed "equivalent" state laws.  *Third*, Plaintiffs' negligence claim fails because the economic loss doctrine bars recovery for purely

1    economic losses, and Plaintiffs do not adequately allege that Block owed them a duty of care or

2    could have prevented any of the harm resulting from Ultimate Partners Investments' ("UPI")

3    allegedly sophisticated scam.  **Fourth**, Plaintiffs' unjust enrichment claim is duplicative of their

4    other claims and thus fails for the same reasons.

5         Accepting Plaintiffs' theory of liability here would set a dangerous precedent, effectively

6    allowing Plaintiffs to convert statutes like the BSA—which is intended to prevent money

7    laundering and terrorism financing through risk-based processes and procedures—into strict

8    liability statutes that impose liability on financial institutions any time a user successfully takes

9    advantage of another on the platform.  Plaintiffs' theory of liability would also transform the BSA

10   into a consumer protection statute, giving rise to civil liability in private litigation even where, as

11   here, Plaintiffs do not point to a single KYC or AML failure that resulted in their alleged

12   victimization. Such a result would exponentially expand the scope of KYC and AML obligations

13   (stretching them far beyond their intended reach), undermine foundational legal principles and the

14   existing risk-based regulatory framework, and place an impossible burden on financial entities,

15   stifling innovation and access in the financial sector.  This outcome cannot be squared with the law.

16   **II.    BACKGROUND**

17       **A.    Online Scams Are Sophisticated Schemes, Utilizing a Variety of Methods to
18            Lure Victims.**

19        Despite growing awareness and the best efforts of regulators and the private sector, the past

20   few years have seen a marked increase in the proliferation of financial scams—including so-called

21   "pig butchering" scams—across the entirety of the global financial sector.  *See* ECF No. 1

22   ("Compl.") ¶¶ 12-14.  Some "studies estimate losses top $1.3 ***trillion*** globally." *Id*. ¶ 12.  The surge

23   in scams in recent years is no coincidence: it is the result of increasingly sophisticated fraudsters

24   who are more cunning and technologically savvy than ever.  *See id.* ¶ 16.  Plaintiffs acknowledge

25   as much in the Complaint yet offer mere generalities about the fraudsters who carry out such scams,

26   rather than any specific facts about the scam to which Plaintiffs allegedly fell victim.  For example,

27   Plaintiffs allege that fraudsters use a variety of methods to lure victims.  For "lonely" victims

28   "seeking connections on dating apps," fraudsters create "extremely realistic" dating app profiles—

using "photos and videos stolen from data hacks and leaks"—and pre-written scripts to provoke emotional reactions. *Id.* ¶ 18. For "the crypto-curious," fraudsters "use[] targeted advertisements on Google, YouTube, Facebook, TikTok, etc." featuring "AI-generated celebrity endorsements." *Id.* ¶ 19. "Additional information about these supposed crypto ventures" can be discovered on "realistic or spoofed website[s] or app[s]," in Google searches showing "phony international business registrations," and with "fervent groups of supposed investors on social media sites" who "share their success stories and give tips on how best to maximize their returns." *Id.* Many of these supposed "methods"—including fake dating app profiles, stolen photographs and videos, and AI-generated endorsements—appear wholly irrelevant to the investment scam alleged in the Complaint. In any event, none of the methods has anything to do with payment processing platforms like Cash App; the "fraud" occurs on third-party social media platforms.

**B.    Block Warns Customers About the Risks of Fraud and Scams on the Cash App Platform.**

Block creates tools that empower businesses, sellers, and individuals to participate in the economy. This includes Cash App, an ecosystem of financial products and services focused on helping consumers make their money go further by enabling customers to store, send, receive, spend, invest, borrow, or save their money. Cash App's mission is to redefine the world's relationship with money by making it more relatable and more accessible to everyday consumers.

"Like all financial services companies, . . . 'Cash App is not immune to bad actors trying to use the platform for illicit purposes.'" Declaration of Alexandra R. Mayhugh ("Mayhugh Decl.") Ex. 5.[2] It "make[s] efforts to identify and reduce the impact of scams on [its] customers" and "partners with law enforcement to 'help disrupt illegal or illicit activity.'" Mayhugh Decl. Ex. 1 at

---

[2] Block respectfully requests the Court consider the February 16, 2024 NBC News article—attached as Exhibit 5 to the Mayhugh Decl. and referenced repeatedly in the Complaint—under the incorporation-by-reference doctrine. *See* Compl. ¶¶ 30, 32-34 & nn. 20-22, 25; *cf. Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1004 (9th Cir. 2018) (upholding district court's decision to incorporate a Wall Street Journal blog post even though "[t]he Complaint only identifies and quotes this blog post once").

32; Ex. 5.[3]  But it is impossible for Block—or any other financial services company—to identify and prevent all criminals seeking to defraud consumers.  Indeed, recognizing the inherent difficulty in preventing third-party criminal activity, regulators demand risk-based BSA compliance programs—not perfection—which "enable[] [financial services companies] to allocate compliance resources commensurate with . . . risk."  Mayhugh Decl. Ex. 3.[4]  Consistent with this guidance, Block tries to further minimize risk and protect customers by issuing warnings like the following:

- "Be on the lookout for fraud and scams.  While we make efforts to identify and reduce the impact of scams on our customers, you should be aware and vigilant that scams may result in the loss of your funds with no recourse" (Mayhugh Decl. Ex. 1, at 32); and

- "Virtual Currency transactions are irreversible, and, accordingly losses due to fraudulent or accidental transactions may not be recoverable and the Company shall not be held liable for any fraudulent or accidental transactions" (*id*. at 46).

**C.    "Ultimate Partners Investments" Convinces Plaintiffs to Invest Thousands of Dollars.**

Plaintiffs allegedly are victims of a sophisticated scam carried out by a third-party entity called Ultimate Partners Investments and involving a multitude of other third-party actors and platforms.  Compl. ¶¶ 46-58.  "Plaintiff Moragne came across an ad for [UPI] on TikTok and Facebook," tempted by the "promis[e] [of] vast returns from a crypto venture."  *Id*. ¶ 46.  "Plaintiff

---

[3] Block respectfully requests the Court consider its Terms of Service ("Terms")—attached as Exhibit 1 to the Mayhugh Decl.—under the doctrines of judicial notice and incorporation by reference.  The Terms of Service are available on Block's website (https://cash.app/legal/us/en-us/tos) and referenced and relied upon repeatedly in the Complaint (*see, e.g.*, Compl. ¶¶ 29 n.19, 37, 51).  *See Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1069 n.3 (N.D. Cal. 2016) (taking "judicial notice of the Yelp Privacy Policies . . . because they were publicly available on the Yelp website and their existence cannot reasonably be questioned"); *Shang v. Twitch Interactive, Inc.*, 2025 WL 56415, at *2 (N.D. Cal. Jan. 9, 2025) (granting request to incorporate Twitch's Terms of Service by reference "[b]ecause the complaint contain[ed] multiple references to [them]").

[4] Block respectfully requests the Court take judicial notice of the *Joint Statement on Risk-Focused Bank Secrecy Act/Anti-Money Laundering Supervision*, dated July 22, 2019, available on FinCEN's website (https://www.fincen.gov/news/news-releases/joint-statement-risk-focused-bank-secrecy-actanti-money-laundering-supervision), and attached as Exhibit 3 to the Mayhugh Decl.  *See Anderson v. Jamba Juice Co.*, 888 F. Supp. 2d 1000, 1003 (N.D. Cal. 2012) (taking judicial notice of a guidance document published on the U.S. Food and Drug Administration website).

Tucker found UPI through Telegram, and was invited to join their group by the administrator, Jim Antonio." *Id.* ¶ 47. Plaintiffs offer various rationale for their decision to invest in UPI, ***none of which has anything to do with Block or Cash App***:

> UPI was registered with the Australian Securities & Investments Commission, had a brochure outlining its business model, a YouTube video explaining its business, a legitimate website, and was backed by a network of online supporters who fervently vouched for it via Telegram. The Telegram page had hundreds of members; many posted screenshots of their gains and openly discussed the extravagant wealth UPI brought them.

*Id.* ¶ 48.[5]

Upon Plaintiffs' decision to invest in UPI, they "navigated to the UPI website, where supposed [UPI] employees walked the Plaintiffs through the investment process on a support line." *Id.* ¶ 50. UPI employees told Plaintiffs "that investments needed to be made via bitcoin" and "they directed Plaintiffs to create Cash App accounts." *Id.* "Once the Plaintiffs' [sic] loaded their Cash App accounts with bitcoin," UPI employees "direct[ed] the Plaintiffs to send that bitcoin" to specific wallet addresses and $Cashtags,[6] which "could also be found on the [T]elegram page." *Id.*[7]

Plaintiffs allege they "started off small, investing only a few hundred dollars." *Id.* ¶ 53. When UPI allowed Plaintiff Tucker to "withdraw approximately $200," he told Plaintiff Moragne about the withdrawal, encouraging her to invest. *Id.* Apparently seeing continued "evidence" of growth, Plaintiffs continued to send more and more bitcoin to UPI until their "investments" grew to approximately $21,000 (Moragne) and $45,000 (Tucker). *Id.* ¶¶ 54-55. Plaintiffs told their "friends and colleagues about UPI" and encouraged them to invest in the scheme as well. *See id.* ¶ 49. Plaintiffs continued to communicate with UPI over this period, including about the status of

---

[5] Plaintiffs also make the conclusory, self-serving allegation that "[t]he fact that the scam happened on Cash App only strengthened [their] belief that the investments were legitimate" (Compl. ¶ 51), but offer no allegations about the statements they allegedly relied upon to conclude a transaction taking place on Cash App would be "legitimate" regardless of the circumstances, nor when they supposedly saw and relied upon those statements.

[6] $Cashtag is a unique identifier for individuals and businesses using Cash App. *See* https://cash.app/help/3123-what-is-a-cashtag.

[7] While not acknowledged in the Complaint, Plaintiffs opened multiple Cash App accounts well before the alleged UPI scheme and proceeded to use those accounts to transfer money both before and after the purported scam.

their investments and how to withdraw money.  *See id.* ¶¶ 53-55.  Notably, ***Plaintiffs do not allege that any of this activity occurred on the Cash App platform***—not the frequent back-and-forth with UPI, not the transfer of funds to supposed "investment" accounts, not the monitoring of those investment accounts, and not the initial withdrawal of funds.  Plaintiffs eventually realized they had been scammed and tried to withdraw the rest of their money.  *Id.* ¶¶ 54-55.  UPI then "banned" Plaintiffs "from the Telegram chat" and "removed" their "UPI accounts."  *Id.* ¶ 56.

> **D.    Plaintiffs Do Not Identify What Part of UPI's Fraudulent Scheme, If Any, Should Have, or Even Could Have, Been Detected by Block.**

Having lost $3,200 and $20,000, respectively, Plaintiffs Moragne and Tucker purportedly tried repeatedly to recover their money, "spen[ding] significant time trying to track down the UPI fraudsters," and "fil[ing] reports with the Federal Trade Commission, the Federal Bureau of Investigation, the Securities and Exchange Committee [sic], and Consumer Financial Protection Bureau."  Compl. ¶¶ 52, 57.  After "[e]ach governmental entity explained . . . that they were unable to assist," Plaintiffs then tried a new tack—blame Block—alleging without any basis that UPI "would have failed legally compliant customer verification protocols," or "[a]lternatively, legally compliant reporting procedures would have required that Cash App flag these accounts on several occasions."  *Id.* ¶ 52.

Plaintiffs, however, do not identify any step that Cash App could have taken to prevent the alleged fraud—most if not all of which took place off the Cash App platform.  *See* Section II.C, *infra*.  Indeed, Plaintiffs fail to allege that UPI even had a Cash App account,[8] much less any characteristics of the recipient Cash App accounts that purportedly should have barred them from the Cash App platform.  Plaintiffs further fail to allege how or why any particular transaction would have been flagged by more robust KYC or AML protocols.  Instead, lacking any evidence that these transactions should have been flagged, Plaintiffs rely almost exclusively on a February 2024 NBC article reporting on anonymous whistleblower complaints, which do not even mention pig

---

[8] Based on the limited allegations in the Complaint, it appears the two Cash App recipient accounts (owned by Daysi Baez and Amelia Crespo) acted, at most, as mules for "UPI."  Plaintiffs allege no indication on the accounts themselves of any affiliation with UPI (*see* Compl. ¶ 52), and it appears that any transfers of funds to UPI would have taken place off the Cash App platform.

butchering scams[9] and focus on pre-2022 business practices, which predate Plaintiffs' first encounter with UPI in "early 2024" by years.  *Compare* Mayhugh Decl. Ex. 5, *with* Compl. ¶¶ 46-47.

## III.    ARGUMENT

Plaintiffs' claims fail for lack of standing because Block did not cause the alleged scam. Relying on a single news article about Block's compliance practices from 2016 to 2022, Plaintiffs speculate that Block should have had specific AML and KYC protocols that could have stopped a 2024 scam.  But they identify no specific requirement Block failed to meet, nor explain how any procedure would have thwarted the scammers' tactics.  Because Plaintiffs cannot show that Block caused their losses, Plaintiffs do not have standing to pursue their claims.

Moreover, even if causation could be shown, the claims fail for other reasons.  *First*, the Complaint violates Rule 8 insofar as it focuses on general policy concerns and irrelevant information rather than facts applicable to Plaintiffs' asserted claims.  *Second*, Plaintiffs cannot bring a UCL claim based on the BSA or state analogs, as those laws offer no private right of action and no violation is plausibly pled.  *Third*, their negligence claim is barred by the economic loss doctrine and fails to establish duty or foreseeability.  And *fourth*, Plaintiffs' unjust enrichment claim is duplicative of their other claims and should be dismissed for the same reasons those other claims should be dismissed.

### A.    Plaintiffs Lack Standing Because They Cannot Tie Any Deficient KYC or AML Requirement to the UPI Scam and Their Resulting Harm.

"To possess Article III standing, plaintiffs must demonstrate three elements: (1) an 'injury in fact,' (2) a 'causal connection between the injury and the conduct complained of,' and (3) that it is 'likely . . . that the injury will be redressed by a favorable decision.'"  *BMA LLC v. HDR Glob. Trading Ltd.*, 2021 WL 949371, at *9 (N.D. Cal. Mar. 12, 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  A "causal connection" requires that "the injury . . . be 'fairly traceable'

---

[9] "Pig butchering scams" involve victims ("pigs") who scammers "fatten up" by "leverag[ing] fictitious identities, the guise of potential relationships, and elaborate storylines."  Compl. ¶ 15 (internal quotations omitted).  "[T]he 'butchering phase' involves convincing victims to invest . . . all with the intent of defrauding them of their investment."  *Id.* (internal quotations omitted).

to the challenged conduct of the defendant and 'not the result of independent action of some third party not before the court." *Id*. (quoting *Lujan*, 504 U.S. at 560); *see also Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013) ("The line of causation between the defendant's action and the plaintiff's harm must be more than attenuated.") (internal quotations omitted). "[W]here the causal chain involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, the causal chain is too weak to support standing." *Wash. Env't Council*, 732 F.3d at 1142 (cleaned up).

Plaintiffs cannot establish a causal connection between the harm they suffered and any conduct by Block. Tempted by "promising vast returns" and "extravagant wealth," Plaintiffs allegedly lost money on a scam perpetrated by third-party UPI. Compl. ¶¶ 46, 48. They first learned of UPI on various social media platforms unrelated to Block, *i.e.*, TikTok, Facebook, and Telegram. *See id*. ¶¶ 46-47. Plaintiffs vetted UPI through channels unrelated to Block—checking the entity's securities registration, a brochure outlining its business model, a YouTube video, a website—and were comforted by "a network of online supporters who fervently vouched for [UPI] via Telegram." *Id*. ¶ 48. They spoke about UPI with their friends. *Id*. ¶ 49. And once Plaintiffs decided to invest, UPI employees told them how to do it, first "direct[ing] Plaintiffs to create Cash App accounts" and then "to send . . . bitcoin" to specified "bitcoin wallet address[es] or $Cashtag[s]." *Id*. ¶ 50. Incredibly, however, Plaintiffs do not seek to recover from UPI, any of the individuals who encouraged them to invest in UPI, the social media platforms, or anyone else. Instead, Plaintiffs have singled out Block to blame by attempting to trace their harm to Block in two ways, neither of which has merit.

**First**, Plaintiffs assert that more robust KYC or AML protocols would have somehow prevented the fraud perpetrated by UPI. *See* Compl. ¶ 52. But they do not allege—plausibly or otherwise—how that would have happened. All Plaintiffs allege is that UPI and its agents "would have failed legally compliant customer verification protocols" or, in the alternative, "legally compliant reporting procedures would have required that Cash App flag these accounts." *Id*. Such boilerplate conclusory assertions, untethered to any facts or well-pled allegations concerning Block, Cash App, or even UPI, cannot establish causation. *See BMA*, 2021 WL 949371, at *9 ("Without

factual allegations that plaintiffs' claimed losses are 'fairly traceable" to *defendants'* alleged conduct, as opposed to acts by third parties or inherent market forces, Article III standing is insufficiently pleaded.") (emphasis in original).    For example, according to Plaintiffs, "whistleblowers . . . accuse Cash App of providing services to entities under sanction," at least some of which are "are known to traffic in stolen data and operate illegal offshore gambling sites." Compl. ¶ 33.  Yet nowhere in the Complaint do Plaintiffs suggest that UPI even was a Cash App user,[10] much less that it is an entity under sanction or traffics in stolen data or operates offshore gambling sites.  Certainly, Plaintiffs do not suggest that either of the alleged Cash App recipient accounts—owned by individuals Daysi Baez and Amelia Crespo—were associated with sanctioned entities or offshore gambling sites.  *See id.* ¶ 52.  Nor did Plaintiffs allege that either of the individual accounts reference or otherwise have any obvious connection to UPI.  Accordingly, Plaintiffs allege no facts from which the Court can infer that any UPI accounts, much less the actual accounts to which Plaintiffs sent money, "would have failed legally compliant customer verification protocols" as Plaintiffs surmise.  *See id.*

As another example of their failure to tie any specific factual allegations to their alleged harm, Plaintiffs rely on FinCEN's guidance on pig butchering scams to identify "especially relevant" red flags.  *See* Compl. ¶ 27.  In doing so, Plaintiffs seem to suggest that the existence of one or more red flags triggers something akin to strict liability.  Not so.  FinCEN has intentionally established a risk-based regime that expects financial institutions to "allocate compliance resources commensurate with . . . risk."  Mayhugh Decl. Ex. 3.  Perfection is not required, and it would be a fool's errand: the scammers are too sophisticated and the potential means of abuse too great for financial institutions to catch every bad actor.  *See* Mayhugh Decl. Ex. 4.[11]  In any event, Plaintiffs

---

[10] As discussed *supra*, neither of the two Cash App recipient accounts identified in the Complaint (Compl. ¶ 52) have any apparent connection to UPI and Plaintiffs' other allegations—including their frequent communication with "UPI," monitoring of their "investments," and withdrawal of money (*id.* ¶¶ 53-56)—make clear that UPI's actions occurred primarily, if not solely, off the Cash App platform.

[11] Block respectfully requests the Court consider the September 8, 2023 *FinCEN Alert on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering"*—attached as Exhibit 4 to the Mayhugh Decl.—under the doctrines of judicial notice and incorporation by reference.  The alert is available on the FinCEN website (https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.

do not explain what part of UPI's fraudulent scheme would have triggered any of the supposedly relevant red flags for Block. Nor could they. The red flags cover a variety of situations not alleged to be at issue here, including (i) customers "distressed or anxious to access funds," (ii) equivalent or near-equivalent incoming and outgoing transfers of virtual currency, (iii) inactive accounts that "begin to show constant, uncharacteristic, sudden, abnormally frequent" withdrawals, (iv) a customer with a history of conducting small-value EFTs "begins sending multiple high-value wire transfers" to holding companies, and (v) repeated access of a customer's account "by unique IP addresses, device IDs, or geographies inconsistent with prior access patterns." *Id.* And even if Plaintiffs had identified a red flag implicated by UPI's fraudulent scheme, FinCEN makes clear that "no single red flag is determinative of illicit or other suspicious activity." *Id.* The appropriate consideration is whether "multiple red flags" are implicated (*id.*); here, the Complaint does not identify even one.

Plaintiffs also point to a 2024 NBC article reporting on anonymous whistleblower allegations covering Cash App's protocols from 2016 to 2022. *See* Compl. ¶¶ 30-33. But nothing in the Complaint ties this 2016 to 2022 conduct to the fraudulent scheme UPI carried out in 2024. The article never mentions UPI or even points to defects in Block systems that would have allowed UPI to evade detection. In fact, the whistleblowers acknowledge that Cash App "***heighten[ed] its*** due diligence on customers in 2023"—at least a year before Plaintiffs first came across UPI. Mayhugh Decl. Ex. 5 (emphasis added). And even if the timeline matched up, the substance of the whistleblower allegations does not. The whistleblower's claims concern prepaid debit cards, Cash App's bank partnership model, and pre-2023 diligence protocols for bitcoin customers, none of which Plaintiffs claim to be at issue here. *See id.* Put simply, Plaintiffs do virtually nothing to tie their own harm to any alleged BSA violation, instead relying almost exclusively on an article

---

pdf) and referenced and relied upon in the Complaint (*see, e.g.*, Compl. ¶¶ 15, 27). *See SVB Fin. Grp. v. Fed. Deposit Ins. Corp.*, 2024 WL 3745009, at *5 (N.D. Cal. Aug. 8, 2024) (taking judicial notice of statements contained in Treasury Department press release because the document "[wa]s a matter of public record"); *Anderson*, 888 F. Supp. 2d at 1003 (taking judicial notice of guidance document published on the U.S. Food and Drug Administration website); *Shang*, 2025 WL 56415, at *2 (granting request to incorporate document by reference "[b]ecause the complaint contain[ed] multiple references to [the document]").

relying on anonymous—and contested—whistleblower allegations that have nothing to do with the Plaintiffs' alleged harm.

None of Plaintiffs' additional factual allegations bolsters their otherwise boilerplate legal conclusions because none of the "facts" has any relation to the fraudulent UPI scheme at issue in the Complaint. Allowing Plaintiffs to proceed on a theory untethered to any facts or well-pled allegations would negate the standing requirement in cases where, as here, a scam victim decides to sue the payment platform that processed the allegedly fraudulent transaction rather than the actual bad actors. *See Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1230-32 (N.D. Cal. 2022) (granting Rule 12(b)(1) motion where plaintiffs could not "trace" alleged harm to defendant's actions).

***Second***, Plaintiffs allege "[t]he fact that the scam happened on Cash App ***only strengthened*** [their] belief that the investments were legitimate," including because Cash App "holds itself out as safe and secure." Compl. ¶ 51 (emphasis added). In other words, Plaintiffs admit that they believed the investments were legitimate before Cash App came into the picture at all. Plaintiffs also ignore that Block discloses the risk of scams and fraudulent transactions in its Terms, which warn customers to "[b]e on the lookout for fraud and scams" and to "be aware and vigilant that scams may result in the loss of your funds with no recourse." Mayhugh Decl. Ex. 1, at 32. With respect to bitcoin transactions, the Terms are even more direct: "Virtual Currency transactions are irreversible, and, accordingly losses due to fraudulent or accidental transactions may not be recoverable and the Company shall not be held liable for any fraudulent or accidental transactions." *Id*. at 46. Plaintiffs accepted these Terms when they opened their Cash App accounts. *See* Compl. ¶ 50. In light of these disclosures, it is implausible that Plaintiffs were unaware of the risks inherent in sending untraceable, virtual currency to strangers and unknown entities. *See Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1063 (N.D. Cal. 2016) (dismissing theory of liability that contradicted provisions in defendant's terms of service), *aff'd*, 700 F. App'x 588 (9th Cir. 2017); *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 596 (S.D.N.Y. 2018) (rejecting misrepresentation-based claims that were "directly at odds" with defendant's terms of service), *aff'd*, 765 F. App'x 586 (2d Cir. 2019).

The Complaint takes a virtual *res ipsa loquitur* view of any fraud on the platform—effectively alleging that because Plaintiffs were scammed, Block's KYC and AML procedures must have been deficient. Yet nothing in the Complaint explains how Block's practices were deficient nor how more robust protocols would have prevented UPI and its agents from taking advantage of Plaintiffs. There is no line of causation and even the one claimed to exist is far too attenuated to support Article III standing.

Plaintiffs' Complaint should be dismissed in whole and with prejudice on this basis alone.

### B.   By Focusing on General Policy Concerns and Irrelevant Facts, the Complaint Violates Rule 8.

Plaintiffs' Complaint—which spends pages pontificating on generic harm associated with scams writ large and cites dozens of footnotes, most referencing third-party commentary addressing "[t]he victimology of online fraud" *(e.g.*, Compl. ¶ 22 n.14)—fails to meet Rule 8's pleading requirements. *See* Fed. R. Civ. P. 8(a)(2), (d)(1) (requiring allegations to be "simple, concise, and direct").

The thrust of Plaintiffs' claims appears to be that Block violates the BSA and "related" statutes mandating KYC and AML protocols. Yet the Complaint does not identify any particular provision of those statutes that was allegedly violated, nor any particular KYC or AML protocol that would have prevented the alleged scams at issue here. Instead, the Complaint expounds on broad-based policy concerns, claiming that "American consumers" lose billions in scams each year, some of which is attributable to "[a] new type of cyber-crime, coined 'pig butchering.'" Compl. ¶¶ 12-14. The Complaint generally describes scammers as "brutal and sophisticated criminal syndicates, frequently located in Southeast Asia," who have taken advantage of the pandemic and rising interest in cryptocurrency investments to defraud victims. *Id*. ¶¶ 16-19. Victims are described as unsuspecting—some "lose their life savings . . . declare bankruptcy or sell their home to finance their newly realized debt." *Id*. ¶ 21. None of these allegations has anything to do with UPI, Plaintiffs, or any of the allegedly fraudulent transactions at issue. Plaintiffs' reliance on "general policy concerns and irrelevant information" is insufficient to maintain a claim for relief and warrants dismissal under Rule 8. *Cousart v. OpenAI LP*, 2024 WL 3282522, at *1 (N.D. Cal.

1   May 24, 2024) (dismissing complaint that "contain[ed] swaths of unnecessary and distracting

2   allegations making it nearly impossible to determine the adequacy of the plaintiffs' legal claims").

3   Plaintiffs' limited allegations concerning Block and the Cash App platform fare no better.

4   They rely entirely on an NBC article that purports to report on old whistleblower allegations

5   concerning topics not at issue here, *e.g.*, "prepaid debit cards," "entities under sanction," "money

6   laundering, terrorism financing and other illegal activities." Compl. ¶¶ 30-33 (internal quotations

7   omitted). Nothing in the Complaint ties any of these "vague assertions" to Plaintiffs' asserted

8   claims or alleged harm. *Martin v. Sephora USA, Inc.*, 2023 WL 2717636, at *6 (E.D. Cal. Mar. 30,

9   2023) (dismissing "impermissibly vague" complaint under Federal Rule of Civil Procedure 8),

10  *report and recommendation adopted*, 2023 WL 3061957 (E.D. Cal. Apr. 24, 2023). In *Martin*, for

11  example, the plaintiffs sought to bring interception claims on behalf of "thousands" of putative

12  class members "with innumerable visits to the Defendant's website 'within the past year.'" *Id.* at

13  *6. The court found that such vague claims ran "afoul of Rule 8" because they failed "to provide

14  enough detail to guide discovery." *Id.* So too here. Plaintiffs seek to represent a class consisting

15  of every person who has ever used Cash App. Compl. ¶ 59. And Plaintiffs allege their putative

16  class claims implicate the entirety of Cash App's compliance regime—***all*** "customer verification

17  and suspicious activity reporting procedures" and compliance with "KYC, AML, ***and other***

18  ***applicable laws***." *Id.* ¶ 63 (emphasis added). Such allegations are too generic, unspecified, and

19  malleable to satisfy Rule 8. *Cousart*, 2024 WL 3282522, at *1; *Martin*, 2023 WL 2717636, at *6.

20      **C.      Plaintiffs Cannot State a UCL Claim Based on Alleged Violations of the BSA**
21              **or Related State Law Statutes.**

22      A plaintiff asserting a UCL claim must allege a "business act or practice" that is unlawful,

23  unfair, or fraudulent. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). Plaintiffs

24  have not stated a UCL claim under any prong.

25      ***First***, to plead a UCL claim, Plaintiffs must show causation. "It is not enough that a plaintiff

26  lost money; to have [statutory] standing, there must be a causal link between the unlawful practice

27  and the loss." *Mayron v. Google LLC*, 54 Cal. App. 5th 566, 574 (2020). As discussed *supra*,

28  Plaintiffs allege no such "causal link." *See* Section III.A, *supra*. Thus, for the same reason that

Plaintiffs fail to establish Article III standing, they have not shown the causation necessary to plead a UCL claim.  *Cf. Bibicheff v. PayPal, Inc.*, 844 F. App'x 394, 397 (2d Cir. 2021) (affirming dismissal of consumer protection claim based on the opening of fraudulent accounts on PayPal for failure to plead causation and noting, "the complaint sets forth no factual allegations to suggest that PayPal would have detected this fraud, even assuming diligent monitoring of the transactions on its platform.").

*Second*, Plaintiffs' unlawful prong claim is based on "violations of the Bank Secrecy Act" and "violations of state law equivalents, such as the California Money Transmission Act."  Compl. ¶ 72.  Neither, however, offers a private right of action.  Indeed, "courts are unanimous in holding that there is no private right of action under the BSA"—"a defendant's liability . . . is to the . . . government."  *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, 2019 WL 3503109, at *7 (N.D. Cal. Aug. 1, 2019); *see also McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382, 1395-98 (2005) (finding "no private right of action for violation of the [California] Financial Code").  And where, as here, a statute does not contain a private right of action, "plaintiffs can't use California law to engineer" one.  *O'Donnell v. Bank of Am., Nat'l Ass'n*, 504 F. App'x 566, 568 (9th Cir. 2013) (affirming dismissal of UCL claim premised on violation of the FTC Act because "[t]he federal statute doesn't create a private right of action, and plaintiffs can't use California law to engineer one"); *McCann*, 129 Cal. App. 4th at 1395-98 (citing with approval federal court decision concluding there was "no private right of action for violation of the Financial Code" and, therefore, "no cause of action under the UCL"); *cf. Kent Grp. Partners, LLC v. Citizens Bank, Nat'l Ass'n*, 688 F. Supp. 3d 608, 615 (N.D. Ohio 2023) (dismissing state-law claim premised on bank's alleged violation of the BSA because statute "create[s] a duty flowing from banks to the government," not from banks to customers), *aff'd sub nom. Kent Grp. Partners, LLC v. Citizens Bank, NA*, 2024 WL 945239 (6th Cir. Mar. 5, 2024).  Plaintiffs cannot base their UCL claim on the BSA or California Money Transmission Act—two statutes that not only do not afford private rights of action but also delegate enforcement solely to the government, not consumers.[12]

---

[12] To the extent Plaintiffs allege other statutory violations of unnamed "state law equivalents" to the BSA (Compl. ¶ 72), their failure to identify the statutes, much less describe how Block allegedly violated their provisions is fatal.  *See Silver v. Stripe Inc.*, 2021 WL 3191752, at *7 (N.D. Cal. July

***Third***, Plaintiffs' fraudulent prong claim hinges on alleged statements that Cash App is "safe" and "secure" and that it notifies users "for suspicious activity." Compl. ¶ 75 (internal quotations omitted). None of these statements is actionable under the UCL. They are classic examples of "generalized, vague and unspecific assertions," which courts have consistently held to be mere "puffery." *Glen Holly Ent. Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1015 (9th Cir. 2003), *opinion amended on denial of reh'g*, 352 F.3d 367 (9th Cir. 2003). Indeed, California courts have repeatedly recognized that "general assertions of superiority," such as being "safe" and "secure," are not actionable because they lack the specificity necessary to mislead a reasonable consumer. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *Halton Co. v. Streivor, Inc.*, 2010 WL 2077203, at \*4 (N.D. Cal. May 21, 2010) (finding "a vague marketing statement would almost certainly be deemed non-actionable puffery under the law").

In any event, in alleging fraud, Plaintiffs fail to satisfy Rule 9(b) because they do not explain the "who, what, when, where, and how" of Block's alleged misstatements, *Kearns*, 567 F.3d at 1124—let alone how "the misrepresentation[s] [were] an immediate cause of [their] injury-producing conduct," *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793 (9th Cir. 2012) (last alteration in original; citation omitted). Plaintiffs do not identify a specific representation Block made to them or how it induced them to send funds to UPI. Nor do Plaintiffs square their alleged reliance on the purported safety and security of the platform with Block's express disclosures in its Terms of Service, which include that users must "[b]e on the lookout for fraud and scams" and that "scams may result in the loss of your funds with no recourse." Mayhugh Decl. Ex. 1, at 32. Far from promising absolute security, Block ***warns*** customers of the possibility of fraudulent activity on Cash App and goes to great lengths to explain to customers the potential risks associated with increasingly complex, third-party scams.[13] Plaintiffs cannot show that Block has

---

28, 2021) (dismissing UCL unlawful claim where complaint did "inadequate job of explaining the specific violations of those statutes"); *In re Actimmune Mktg. Litig.*, 2009 WL 3740648, at \*15 (N.D. Cal. Nov. 6, 2009) (dismissing UCL claim where complaint failed to "mention any specific sections of the [statutes] that defendants violated, let alone the elements necessary to prove such violations"), *aff'd*, 464 F. App'x 651 (9th Cir. 2011).

[13] Among other things, Block has drafted and published a white paper "examin[ing] the growing complexity of scams" and detailing the steps Block takes to "continually . . . protect, educate, and empower all of its current customers and the broader public to identify and take action against

1  made any misrepresentations to its customers and, even if it had, Plaintiffs' failure to tie any

2  supposed misrepresentation to their alleged harm is fatal to their claim. *See Herrick*, 306 F. Supp.

3  3d at 596-97 (rejecting fraud claim based on alleged misrepresentations that were inconsistent with

4  express disclaimers in defendant's terms of service).

5        *Finally*, Plaintiffs' unfair prong claim fails because it is based on the same alleged conduct

6  as their claims under the other prongs. *See* Compl. ¶ 74 (referencing statutes underlying unlawful

7  prong claim and asserting "Cash App's failure to comply with these laws also violates the UCL's

8  proscription against unfair conduct"). And where the allegedly unfair practice "overlaps entirely

9  with the practices addressed under the fraudulent and unlawful prongs of the UCL, the former may

10  be dismissed when the latter prongs do not survive." *Knuttel v. Omaze, Inc.*, 2022 WL 1843138,

11  at *13 (C.D. Cal. Feb. 22, 2022); *see also Holmes v. Johnson & Johnson*, 617 F. App'x 639, 644

12  (9th Cir. 2015) (dismissing unfair prong claim because "the same activity [] form[ed] the basis of

13  [the] fraudulent ground"); *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal.

14  2017) (collecting cases).

15        Even if Plaintiffs had identified additional, supposedly "unfair" conduct (they have not),

16  their unfair prong claim still fails because they do not offer any non-conclusory allegations that

17  Block's business practices "violate[] established public policy," or are "immoral, unethical,

18  oppressive or unscrupulous." *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006).

19  To the contrary, Plaintiffs ***ignore*** established public policy in this arena, including regulators' focus

20  on risk-based compliance regimes rather than *res ipsa loquitor* liability. *See* Section II.B, *supra*.

21  Nothing Block did (or did not do) in relation to the allegedly fraudulent UPI scheme is unfair.

22  Plaintiffs' attempt to transform the carefully balanced BSA regulatory framework by demanding

23  private rights of action where none exist and imposing liability for the conduct of third-party

24  criminal actors should be rejected.

25  potential scams." Mayhugh Decl. Ex. 2. These steps include, *inter alia*, running "national

26  campaigns to build awareness of scams" and commissioning "a satellite media tour with Cash

27  App's Head of Security" who told customers how to "protect themselves from fraud and scams."

   *Id.* Block respectfully requests the Court take judicial notice of this white paper, which is publicly

28  available on Block's website and whose "existence cannot reasonably be questioned." *Opperman*,

   205 F. Supp. 3d at 1069 n.3.

Moreover, in assessing whether a practice is unfair, courts balance the "impact on its alleged victim" against "the reasons, justifications, and motives of the alleged wrongdoer." *McKell*, 142 Cal. App. 4th at 1473. Plaintiffs do not engage with this balancing test or make anything more than conclusory statements about Block's allegedly "immoral, oppressive, [or] unscrupulous" conduct. Compl. ¶ 74. This is an independent reason to dismiss Plaintiffs' unfair prong claim. *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1170-71 (9th Cir. 2012) (affirming dismissal of unfair prong claim where complaint failed to allege facts suggesting conduct at issue was "against public policy, immoral, unethical, oppressive, or unscrupulous"); *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 858 (N.D. Cal. 2012) (dismissing UCL unfair prong claim where plaintiff made only "conclusory statements" about the allegedly unfair conduct).

### D. Plaintiffs Fail to State a Claim for Negligence.

Plaintiffs' negligence claim fails for two independent reasons: (1) the economic loss doctrine bars recovery for purely economic losses; and (2) Plaintiffs do not adequately allege that Block owed any duty of care or caused them to invest in the UPI scam.

***First***, Plaintiffs seek to recover purely economic losses, *i.e.*, lost money, "lost time in trying to track down lost funds," and "out-of-pocket costs." Compl. ¶ 89. None of these economic losses, however, are recoverable under the economic loss doctrine, which bars negligence claims for "purely economic losses" without any accompanying physical or property damage. *See, e.g., Meisner v. JPMorgan Chase Bank, N.A.*, 2022 WL 837230, at *6 (E.D. Cal. Mar. 21, 2022) ("Multiple courts have applied the economic loss rule to bar a plaintiff's claim against a bank arising from fraudulent activity."); *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 2016 WL 6523428, at *12 (S.D. Cal. Nov. 3, 2016) (finding unauthorized credit card transactions, "theft of [the plaintiff's] credit card information, costs associated with prevention of identity theft, and costs associated with time spent and loss of productivity" were purely economic injuries).[14] This

---

[14] *See also In re Bank of Am. Cal. Unemployment Benefits Litig.*, 674 F. Supp. 3d 884, 920–21 (S.D. Cal. 2023) ("[f]or the most part, district courts in California have treated time lost responding to a data breach as a purely economic injury for which recovery is barred by the economic loss doctrine"); *Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *8 (N.D. Cal. Mar. 5, 2021) (lost time responding to data breach was purely economic injury).

1    outcome makes sense: if plaintiffs were allowed to recover in tort for "pure economic loss

2    suffered," it would "raise[ ] the spectre of vast numbers of suits and limitless financial exposure."

3    *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 401-02 (2019) (quoting *Bily v. Arthur Young & Co.*, 3

4    Cal.4th 370, 400 (1992)).  For that reason, courts consistently hold that "liability in negligence for

5    purely economic losses . . . is 'the exception, not the rule.'"  *Id*. (quoting *Quelimane Co. v. Stewart

6    Title Guaranty Co.*, 19 Cal.4th 26, 58 (1998)).[15]

7         **Second**, Plaintiffs have not—and cannot—show that Block owed them a duty of care.

8    Generally, "a business entity has no duty to prevent financial loss to others with whom it deals

9    directly."  *Quelimane*, 19 Cal. 4th at 59; *see also Bibicheff*, 844 F. App'x at 395-96 (affirming

10   dismissal of negligence claim against PayPal because "courts generally do not impose a duty on

11   businesses to protect their customers from the acts of third parties absent special circumstances");

12   *Johnson v. Maker Ecosystem Growth Holdings Inc.*, 2023 WL 2191214, at *4-6 (N.D. Cal. Feb.

13   22, 2023) (Chesney, J.) (dismissing negligence claim for failure to identify the source of any alleged

14   duty and as barred by the economic loss doctrine).  And it is well established that banks and money

15   transmitters do not owe their customers a duty to monitor accounts for potentially fraudulent

16   activity, to supervise account activity, or to inquire as to why funds are being withdrawn or

17   transferred.  *See*, *e.g.*, *Tristan v. Bank of Am.*, 2023 WL 4417271, at *25 (C.D. Cal. June 28, 2023)

18   (collecting cases and finding bank and money transfer service had no duty of care to customers);

19   *Kurtz-Ahlers, LLC v. Bank of Am., N.A.*, 48 Cal. App. 5th 952, 962 (2020) (holding that "'overriding

20   policy considerations' preclude the existence of an 'intra-bank' monitoring duty under general tort

21   principles") (citation omitted); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49

22

23   [15] Plaintiffs do not allege they have a "special relationship" with Block under *Biakanja v. Irving*,
     49 Cal. 2d 647 (1958), and *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799 (1979), and for good reason.
24   In *Sheen v. Wells Fargo Bank, N.A.*, the Supreme Court of California explained that *Biakanja* makes
     clear that its "multifactor test finds application only when the plaintiff is a 'third person not in
25   privity' with the defendant."  12 Cal. 5th 905, 936-37 (2022) (quoting *Biakanja*, 49 Cal. 2d at 650).
     "Under its terms, *Biakanja* does *not* apply when the plaintiff and defendant are in contractual
26   privity for purposes of the suit at hand."  *Id.* (declining to apply *Biakanja* to avoid economic loss
     doctrine based on special relationship where contractual privity existed).  Here, where the Terms
27   govern Plaintiffs and Block's relationship, Plaintiffs cannot avoid the economic loss rule by
     claiming they have a "special relationship" with Block.
28

Cal. App. 4th 472, 481 (1996) (bank had no duty to supervise or track account activity even when customers "deposited and simultaneously withdrew hundreds of thousands of dollars," which was "a sharp indicator of money laundering"). Indeed, in *Bibicheff*, the Second Circuit affirmed dismissal of a negligence claim based on PayPal's alleged failure to "monitor and investigate twelve fake accounts created under [the plaintiff's] name . . . by her office manager, who defrauded her." 844 F. App'x at 395. As the court explained, plaintiff "failed to plead that PayPal owed her a duty" because "courts generally do not impose a duty on businesses to protect their customers from the acts of third parties." *Id*. at 395-96.

Plaintiffs allege that Block had "a common law duty to prevent foreseeable harm to others," and that "Defendants owed Plaintiffs and the Scam Subclass a duty to protect their financial accounts from malicious third parties, to adequately warn them of known risks and/or dangers associated with the Cash App platform, to take appropriate steps in response to known scams involving the Cash App platform, to provide an adequate customer support helpline, and to properly investigate disputed transactions initiated and consummated through Cash App." Compl. ¶¶ 79-80. Yet Plaintiffs do not allege "the source of any of these alleged duties, nor do they set forth facts to plausibly establish the existence of such duties." *Tristan*, 2023 WL 4417271, at *15 (dismissing negligence claim premised on virtually identical alleged duties); *see MH Pillars Ltd. v. Realini*, 2017 WL 916414, at *5 (N.D. Cal. Mar. 8, 2017) (dismissing negligence claim against defendants, including money transmitter, because plaintiffs "alleged no facts showing that any defendant owed a legal duty of care to any plaintiff"). Moreover, there is no "special relationship" between Block and its customers that gives rise to a general duty to supervise or protect. *See, e.g.*, *Copesky v. Super. Ct.*, 229 Cal. App. 3d 678, 694 (1991) (bank-depositor relationship is not a "special relationship" giving rise to tort remedies); *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Grp.*, 143 Cal. App. 4th 1036, 1042 (2006) (the special relationship doctrine does not "create broad tort duties in arms-length business dealings whenever it is convenient to resort to the law of negligence"); *Whitesides v. E*TRADE Sec., LLC*, 2021 WL 930794, at *6 (N.D. Cal. Mar. 11, 2021) (no special relationship where plaintiffs did "not plead intent particular to them, as opposed to all users of E*TRADE's trading platform").

To the extent Plaintiffs try to premise a duty of care on the BSA (*see* Compl. ¶ 81), that too fails. "[C]ourts are unanimous in holding that there is no private right of action under the BSA." *Venture Gen. Agency*, 2019 WL 3503109, at *7 (dismissing negligence claim because there is no private right of action under the BSA and the regulatory scheme does not create a duty of care); *In re Agape Litig.*, 681 F. Supp. 2d 352, 360-61 (E.D.N.Y. 2010) (granting motion to dismiss negligence claim "because the [BSA] does not create a private right of action [and] the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements"); *Public Serv. Co. of Okla. v. A Plus, Inc*., 2011 WL 3329181, at *8 (W.D. Okla. Aug. 2, 2011) ("Courts have repeatedly rejected negligence claims based on a bank's duty arising under the [BSA], concluding a bank's duty created by the Act is owed *only* to the government and not to private parties."). Therefore, the BSA does not and cannot create a duty of care. *Venture Gen. Agency*, 2019 WL 3503109, at *7; *see also S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1163-64 (N.D. Cal. 2020) (dismissing negligence claim premised on BSA); *Kent Grp. Partners*, 688 F. Supp. 3d at 615-16 (granting motion to dismiss because the BSA does not create a duty of care).

**Finally**, even if Block did owe a duty of care, Plaintiffs fail to identify anything in the UPI scheme that would have raised a red flag or otherwise would have been caught by more robust KYC/AML protocols. *See* Section III.A, *supra*. Their failure to show that Block's actions (or inactions) caused Plaintiffs' harm is an independent basis to dismiss their negligence claim. *Vasquez v. Residential Invs., Inc.*, 118 Cal. App. 4th 269, 288 (2004) ("In a negligence action the plaintiff must show the defendant's act or omission (breach of duty) was a cause of the plaintiff's injury."); *Sandoval v. Bank of Am.*, 94 Cal. App. 4th 1378, 1385 (2002) ("In California, the causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty . . . was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability") (citation omitted).

**E.      Plaintiffs Fail to State a Claim for Unjust Enrichment.**

Plaintiffs' unjust enrichment claim fails for at least two independent reasons: (1) it is duplicative of Plaintiffs' other claims; and (2) Plaintiffs do not allege they lack an adequate remedy at law.[16]

"[P]laintiffs can not assert unjust enrichment claims that are merely duplicative of statutory or tort claims." *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011) (dismissing unjust enrichment claim because it was duplicative); *see Gudgel v. Clorox Co.*, 514 F. Supp. 3d 1177, 1188 (N.D. Cal. 2021) (dismissing unjust enrichment claim because "plaintiff does not identify any independent theory of unjust enrichment that does not rise or fall with her statutory claims") (internal quotations and citation omitted).  Plaintiffs plead the same alleged misrepresentations in support of their unjust enrichment claim as they do for their UCL claim.  *Compare* Compl. ¶¶ 70-77, *with id.* ¶¶ 90-96.  This Court has dismissed unjust enrichment claims under precisely these circumstances.  *See In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *24 ("by proceeding with their respective claims for restitution under the UCL," plaintiffs "have chosen to sue in tort" and, therefore, their "unjust enrichment claims under California law are 'duplicative' and subject to dismissal").[17]

Even if Plaintiffs' unjust enrichment claim were not duplicative, Plaintiffs fail to "plausibly allege . . . that [they] lack[] an adequate remedy at law." *Bryan v. Del Monte Foods, Inc.*, 2023 WL 4758452, at *8 (N.D. Cal. July 25, 2023) (Chesney, J.) (construing unjust enrichment claim as

---

[16] While "unjust enrichment" is not itself "a cause of action or even a remedy," courts often construe such claims as seeking "restitution on a quasi-contract theory." *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *24 (N.D. Cal. Sept. 22, 2021) (Chesney, J.) (internal quotations and alteration omitted).  Here, however, Plaintiffs' allegations cannot support a quasi-contract claim because the "parties have an enforceable agreement regarding a particular subject matter." *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388 (2012).  That is, Plaintiffs (as Cash App users) have consented to Block's Terms of Service, which undisputedly cover the subject matter alleged in the Complaint, including the risk of fraud and scams.  *See* Section II.B, *supra*.  This is an independent basis to dismiss Plaintiffs' unjust enrichment claim.

[17] At the very least, Plaintiffs' unjust enrichment claim fails for the same reasons it other claims do. *See Hawkins v. Shimano North America Bicycle Inc.*, 729 F.Supp.3d 989, 1029 (C.D. Cal. 2024) ("[W]hen an unjust enrichment claim is duplicative of another claim, and 'the Court has dismissed those other claims . . . Plaintiff's claim for unjust enrichment fails' as well.").

standalone equitable claim, but dismissing it for failure to plead plaintiff lacked adequate legal remedies); *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (holding "[plaintiff] must establish that she lacks an adequate remedy at law before securing equitable restitution"); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 899 (C.D. Cal. 2024) (same); *Medoff v. Minka Lighting, LLC*, 2023 WL 4291973, at *12 (C.D. Cal. May 8, 2023) (while plaintiffs may plead remedies in the alternative, they then "must plausibly allege or explain how the equitable relief they seek alongside damages is more prompt, certain, or efficient than damages").  Plaintiffs do not allege anywhere that they "lack an adequate remedy at law," let alone explain why that might be the case.  Nor do Plaintiffs explain why or how the equitable relief they seek is "more prompt, certain, or efficient than damages."  *Medoff*, 2023 WL 4291973, at *12.

## IV.    CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.


Dated: April 21, 2025                              COOLEY LLP


                                                  By: */s/ Alexandra R. Mayhugh*
                                                      Alexandra R. Mayhugh

                                                  Attorneys for Defendants